[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 10-5057**

IN THE

# United States Court of Appeals for the District of Columbia Circuit

---

AMERICAN BAR ASSOCIATION,

*Plaintiff-Appellee*,

*v.*

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**BRIEF FOR PLAINTIFF-APPELLEE AMERICAN BAR ASSOCIATION**

---

James F. Segroves
Chervonne C. Stevenson
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2533
(202) 416-6800

R. Thomas Howell, Jr.
Patricia J. Larson
AMERICAN BAR ASSOCIATION
321 N. Clark Street
Chicago, IL 60654-7598
(312) 988-5215

Mark D. Harris
Kristen J. Mathews
Rebecca L. Ambrose
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

Clifford S. Davidson
PROSKAUER ROSE LLP
2049 Century Park East
Los Angeles, CA 90067-3206
(310) 284-4584

*Counsel for Plaintiff-Appellee American Bar Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.     PARTIES

The Federal Trade Commission ("Commission") is the appellant, having served as the defendant below.  The American Bar Association ("ABA") is the appellee, having served as the plaintiff below.  The American Association for Justice filed a brief *amicus curiae* in the district court.  The following entities have noticed their intent to file briefs *amicus curiae* in this Court: (1) the New York State Bar Association; (2) the American Institute of Certified Public Accountants; (3) the American Medical Association; (4) the American Congress of Obstetricians and Gynecologists; (5) the American Osteopathic Association; (6) the American Society of Cataract and Refractive Surgeons; (7) the Illinois Osteopathic Medical Society; (8) the Medical Society of the District of Columbia; (9) the Missouri Association of Osteopathic Physicians and Surgeons; (10) the Ohio Osteopathic Association; and (11) the Osteopathic Physicians and Surgeons of Oregon.

## II.     RULINGS UNDER REVIEW

The Commission appeals from the final judgment entered by the United States District Court for the District of Columbia (Reggie B. Walton, J.) on December 28, 2009.  Joint Appendix ("JA") 218.  The district court's

memorandum opinion explaining its reasoning for granting the ABA's motion for summary judgment, JA 177-216, is reported at 671 F. Supp. 2d 64.

## III.   RELATED CASES

This case has not previously been before this Court.  There are no "related cases" within the meaning of Circuit Rule 28(a)(1)(C).  Although they do not fall within the meaning of Circuit Rule 28(a)(1)(C), the ABA is aware of two additional cases challenging aspects of the Commission's extended enforcement policy at issue in this appeal.  Both of those cases have been stayed pending the outcome of this appeal.  *See Am. Inst. of Certified Pub. Accountants v. FTC*, Civil Action No. 09-2116 (RBW) (D.D.C. filed Nov. 10, 2009, stayed Mar. 22, 2010); *Am. Med. Ass'n v. FTC*, Civil Action No. 10-843 (RBW) (D.D.C. filed May 21, 2010, stayed June 25, 2010).

    /s/ Mark D. Harris    
Mark D. Harris

# <u>CORPORATE DISCLOSURE STATEMENT</u>

The ABA is a voluntary professional association whose membership includes lawyers in private law firms, corporations, nonprofit organizations, government agencies, and prosecutorial and public defender offices, as well as judges, legislators, law professors, and law students.  Organized as an Illinois not-for-profit corporation, the ABA has no parent companies and no publicly held company owns a 10 percent or greater ownership interest in the ABA.


    <u>   /s/ Mark D. Harris   </u>
       Mark D. Harris

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES ................................................................i

CORPORATE DISCLOSURE STATEMENT ............................................. iii

TABLE OF AUTHORITIES ....................................................................vii

GLOSSARY ...............................................................................................xv

PRELIMINARY STATEMENT ....................................................................1

COUNTERSTATEMENT OF ISSUES
PRESENTED FOR REVIEW ....................................................................4

PERTINENT STATUTES AND REGULATIONS .........................................5

STATEMENT OF FACTS ...........................................................................5

    A.    Statutory Background ....................................................................5

    B.    Regulatory Background ..................................................................6

        1.    The Red Flags Rule ...........................................................6

        2.    The Commission's First Delay And Its
            Original Enforcement Policy ................................................9

        3.    The Commission's Second Delay And Its
            Extended Enforcement Policy ...........................................10

        4.    The Commission's Third Delay And Its
            Frequently Asked Questions .............................................11

    C.    District Court Proceedings .........................................................12

SUMMARY OF THE ARGUMENT.................................................................19

ARGUMENT ..............................................................................................22

I.    Under The Well-Established Law Of This Circuit, An
      "Unmistakably Clear" Grant Of Statutory Authority Is
      Required Before The Commission May Regulate The
      Practice Of Law, Which Is Completely Absent From The
      FACT Act ...........................................................................22

II.   The Plain Language Of The FACT Act Demonstrates
      That Congress Did Not Delegate To The Commission
      The Authority To Regulate Lawyers Engaged In The
      Practice Of Law .................................................................31

III.  Even If The FACT Act Were Ambiguous, The
      Commission's Interpretation Would Be Unreasonable ......................39

      A.    At Most, The Extended Enforcement Policy Is
            Entitled To *Skidmore* Deference ................................................39

      B.    The Interpretation Contained In The Extended
            Enforcement Policy Is Unreasonable ..........................................40

            1.    The Extended Enforcement Policy
                  Disregards The Statutory Definition Of
                  "Credit," Which Requires The "Right" To
                  Defer Payment ..................................................41

            2.    No Deference Should Be Given To The
                  Commission's Mistaken Reliance On A Safe-
                  Harbor Interpretation Issued By The
                  Federal Reserve Board's Staff ..........................................46

IV.   The Court Should Reject The Commission's Modified
      Facial Challenge Argument ....................................................54

      A.    The Commission Waived Its "Plainly Legitimate
            Sweep" Argument By Failing To Raise It In The
            District Court ..................................................55

      B.    The Commission's "Plainly Legitimate Sweep"
            Argument Is Substantively Meritless ..........................................56

- v -

CONCLUSION..........................................................................................60

CERTIFICATE OF COMPLIANCE ..............................................61

CERTIFICATE OF SERVICE .........................................................62

ADDENDUM:

    12 C.F.R. § 202.1 (2010)…………………………..…………………..….…...1a

    12 C.F.R. § 202.2 (2010)…………………..………………..……...………2a

    12 C.F.R. § 202.3 (2010)…………………..………………..………4a

    12 C.F.R. pt. 202, supp. I (2010) (excerpt) …..…………………..…………6a

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

\* *Am. Bar Ass'n v. Fed. Trade Comm'n,*
   430 F.3d 457 (D.C. Cir. 2005)...............................................1, 2, 4, 14, 19, 20, 22, 24, 25, 26, 27, 30, 31

*Barney v. Waldron,*
   110 F.3d 1207 (6th Cir. 1997)...........................................................45

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973)..........................................................................57

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984)................................................................23, 50, 55

*Christiano v. Bonesteel,*
   No. CV 89 0104622, 1991 WL 162160 (Conn. Super. Ct. Aug. 16, 1991)......29

*City of Abilene v. FCC,*
   164 F.3d 49 (D.C. Cir. 1999)............................................................24

*Crawford v. Marion County Election Bd.,*
   553 U.S. 181 (2008)......................................................................56, 57

*Crowe v. Henry,*
   43 F.3d 198 (5th Cir. 1995)..............................................................39

*Foley, Hoag & Eliot,*
   229 N.L.R.B. 456 (1977) ..................................................................39

*Ford Motor Credit Co. v. Milhollin,*
   444 U.S. 555 (1980)..................................................................51, 52, 53

*Goldfarb v. Va. State Bar,*
   421 U.S. 773 (1975)..........................................................36, 37, 38, 51

---

\*   Authorities upon which we chiefly rely are marked with asterisks.

*Goldstein v. SEC,*
    451 F.3d 873 (D.C. Cir. 2006)..................................................................33

*Gonzales v. Oregon,*
    546 U.S. 243 (2006)..................................................................................39

*Heintz v. Jenkins,*
    514 U.S. 291 (1995)..................................................................35, 36, 38, 51

*Hishon v. King & Spalding,*
    467 U.S. 69 (1984)....................................................................................39

*In re Brazil,*
    21 B.R. 333 (Bankr. N.D. Ohio 1982).......................................................43

*Kline v. 1st W. Gov't Sec. Inc.,*
    24 F.3d 480 (3d Cir. 1994) .......................................................................39

*Koszola v. FDIC,*
    393 F.3d 1294 (D.C. Cir. 2005)...........................................................16, 53

*Lewis v. ACB Bus. Servs., Inc.,*
    135 F.3d 389 (6th Cir. 1998).....................................................................43

*Lorillard v. Pons,*
    434 U.S. 575 (1978)..................................................................................53

*Mays v. Buckeye Rural Elec. Coop., Inc.,*
    277 F.3d 873 (6th Cir. 2002).....................................................................45

*Mick's at Penn. Ave., Inc. v. BOD, Inc.,*
    389 F.3d 1284 (D.C. Cir. 2004).................................................................43

*Milavetz, Gallop & Milavetz v. United States,*
    130 S. Ct. 1324 (2010).....................................................................37, 38, 51

*N.Y. State Bar Ass'n v. FTC,*
    Civil Action No. 02-810 (RBW), 2004 WL 964173
    (D.D.C. Apr. 30, 2004) .............................................................................23

*Nat'l Ass'n of Mfrs. v. Dep't of Labor,*
      159 F.3d 597 (D.C. Cir. 1998)..............................................................56

*NSTAR Elec. & Gas Corp. v. FERC,*
      481 F.3d 794 (D.C. Cir. 2007)..............................................................55

*PDK Labs. v. DEA,*
      362 F.3d 786 (D.C. Cir. 2004)..............................................................31

*Potter v. District of Columbia,*
      558 F.3d 542 (D.C. Cir. 2009)..............................................................55

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.,*
      489 F.3d 1267 (D.C. Cir. 2007)............................................................50

\* *Riethman v. Berry,*
      287 F.3d 274 (3d Cir. 2002) ....................................42, 43, 44, 45, 53

*S.E. Ala. Med. Ctr. v. Sebelius,*
      572 F.3d 912 (D.C. Cir. 2009)..............................................................51

*Salazar v. District of Columbia,*
      602 F.3d 431 (D.C. Cir. 2010)..............................................................56

*Shaumyan v. Sidetex Co.,*
      900 F.2d 16 (2d Cir. 1990) ......................................17, 43, 45, 46, 53

*Skidmore v. Swift & Co.,*
      323 U.S. 134 (1944)........................................................................17, 40

*Trapasso v. Lopez,*
      No. 139377, 1995 WL 17215792 (Mass. Land Ct. Feb. 16, 1995)..................29

*United States ex rel. Long v. SCS Bus. & Technical Inst., Inc.,*
      173 F.3d 870 (D.C. Cir. 1999)..............................................................36

*United States v. Salerno,*
      481 U.S. 739 (1987)........................................................................55, 57

*Virginia v. Hicks,*
   539 U.S. 113 (2003)....................................................................57

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008)..........................................................54, 56, 57

*Washington v. Glucksberg,*
   521 U.S. 702 (1997)..............................................................56, 57

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001)....................................................................24

*Will v. Mich. Dep't of State Police,*
   491 U.S. 58 (1989)......................................................................25

*Wyatt v. Cole,*
   504 U.S. 158 (1992)....................................................................39

### STATUTES

Equal Credit Opportunity Act,
   15 U.S.C. §§ 1691-1691f...............................................................6

   15 U.S.C. § 1691a(d) .............................................................6, 41

   15 U.S.C. § 1691a(e)....................................................................6

   15 U.S.C. § 1691e(e)....................................................................47

Fair and Accurate Credit Transactions Act of 2003,
   15 U.S.C. §§ 1681-1681x................................................................1

   15 U.S.C. § 1681a(r)(5) ................................................................6

   15 U.S.C. § 1681m(e)(1)(A) .......................................................5, 32

   15 U.S.C. § 1681m(e)(1)(B) ...........................................................5

   15 U.S.C. § 1681m(e)(2)(B) ..........................................................32

15 U.S.C. § 1681m(h)(8)(B) .................................................................6

Fair Debt Collection Practices Act,
    15 U.S.C. § 1692a(6) ....................................................................35

Gramm-Leach-Bliley Act,
    15 U.S.C. § 6804(a)(1) ..................................................1, 22, 23, 25

    15 U.S.C. § 6805(a)(7) ..................................................................23

Sherman Act,
    15 U.S.C. § 1 ...............................................................................36

Truth in Lending Act,
    15 U.S.C. § 1601 *et seq.* ..............................................................51, 52

**REGULATIONS**

Red Flags Rule,
    16 C.F.R. pt. 681 ............................................................................2

    16 C.F.R. § 681.1 ............................................................................7

    16 C.F.R. § 681.1(a) ........................................................................8

    16 C.F.R. § 681.1(b)(4) ....................................................................8

    16 C.F.R. § 681.1(b)(5) ....................................................................8

    16 C.F.R. § 681.1(b)(9) ....................................................................7

    16 C.F.R. § 681.1(d)(1) ....................................................................7

    16 C.F.R. § 681.1(d)(2) ....................................................................8

    16 C.F.R. § 681.1(d)(2)(i) .................................................................7

    16 C.F.R. § 681.1(d)(2)(iii) ...............................................................7

    16 C.F.R. § 681.1(e)(3) ....................................................................8

16 C.F.R. pt. 681, app. A, ¶ III ................................................8

16 C.F.R. pt. 681, app. A, ¶ IV ...............................................8

16 C.F.R. pt. 681, app. A, ¶ VI(b) ..........................................8

Regulation B,
12 C.F.R. pt. 202 ...............................................47, 48, 49, 50, 53

12 C.F.R. § 202.2(h) .............................................................47

12 C.F.R. § 202.2(j) ..............................................................47

12 C.F.R. § 202.2(*l*) .............................................................47

12 C.F.R. § 202.3 ..................................................................27

12 C.F.R. § 202.3(c)(1) .........................................................47

12 C.F.R. pt. 202, supp. I, introduction ...............................49

12 C.F.R. pt. 202, supp. I, § 202.2, ¶ 2(j)-1 ...................48, 49

12 C.F.R. pt. 202, supp. I, § 202.3, ¶ 3(c)-1 ........................48

Regulation Z,
12 C.F.R. pt. 226 .............................................................51, 52

## OTHER AUTHORITIES

American Heritage Dictionary (2d College ed. 1982)...................33, 42

Black's Law Dictionary (9th ed. 2009)...............................................42

*Confirming Clients' Identities*, Conn. Law Tribune (May 10, 2010) .............30

Douglas S. Malan, *Imposter Clients Land Attorneys In Hot Water*,
    Conn. Law Tribune (Sept. 14, 2009) ..................................30

Fed. Trade Comm'n, FTC Enforcement Policy: Identity
    Theft Red Flags Rule, 16 CFR 681.2 (Oct. 22, 2008).......................9

Fed. Trade Comm'n, FTC Extended Enforcement
  Policy: Identity Theft Red Flags Rule, 16 CFR
  681.1 (Apr. 30, 2009) .........................................................10, 11, 12, 17, 20, 22,
                                                      25, 27, 39, 40, 41, 48, 56, 58

Fed. Trade Comm'n, The Red Flags Rule: Frequently Asked
  Questions (July 29, 2009) ....................................................12, 40, 58

Final Rule, Identity Theft Red Flags and Address Discrepancies
  Under the Fair and Accurate Credit Transactions Act of 2003,
  72 Fed. Reg. 63,718 (Nov. 9, 2007)....................................................7

H.R. 3763, 111th Cong. (2010) ...........................................................36

H.R. Rep. No. 108-396 (2003) (Conf. Rep.),
  *as reprinted in* 2003 U.S.C.C.A.N. 1753.......................................34

Model Rules of Prof'l Conduct R. 1.2(d) ...........................................28

Model Rules of Prof'l Conduct R. 1.6(b)(2)........................................28

Model Rules of Prof'l Conduct R. 4.1 .................................................28

Model Rules of Prof'l Conduct R. 8.4(c)..............................................28

Official Staff Commentary to Regulation B,
  50 Fed. Reg. 48,018 (Nov. 20, 1985)...................................................48

Press Release, FTC Announces Expanded Business Education
  Campaign on 'Red Flags' Rule (July 29, 2009)..............................11

Press Release, FTC Will Grant Six-Month Delay of Enforcement
  of 'Red Flags' Rule Requiring Creditors and Financial Institutions
  to Have Identity Theft Prevention Programs (Oct. 22, 2008)......................9

Press Release, FTC Will Grant Three-Month Delay of Enforcement
  of 'Red Flags' Rule Requiring Creditors and Financial Institutions
  to Adopt Identity Theft Prevention Programs (Apr. 30, 2009)...................10

S. 3416, 111th Cong. (2010) ................................................................36

Technical Corrections, Identity Theft Red Flags and Address
    Discrepancies Under the Fair and Accurate Credit Transactions
    Act of 2003, 74 Fed. Reg. 22,639 (May 14, 2009) .............................................7

# **GLOSSARY**

| | |
|---|---|
| ABA | American Bar Association |
| Board | Federal Reserve Board |
| Commission | Federal Trade Commission |
| ECO Act | Equal Credit Opportunity Act |
| FACT Act | Fair and Accurate Credit Transactions Act of 2003 |
| FTC | Federal Trade Commission |
| GLBA | Gramm-Leach-Bliley Act |
| JA | Joint Appendix |
| TILA | Truth in Lending Act |

## PRELIMINARY STATEMENT

Five years ago, this Court rejected an attempt by the Federal Trade Commission ("Commission") to impose burdensome new regulations on lawyers that would have intruded on their relationships with their clients.  In *American Bar Association v. Federal Trade Commission*, 430 F.3d 457 (D.C. Cir. 2005) ("*ABA-GLBA*"), the Court reviewed regulations concerned with the protection of confidential and private customer information maintained by "financial institutions."  While the authorizing statute in that case, the Gramm-Leach-Bliley Act ("GLBA"), contained no indication that Congress thought lawyers counted as financial institutions and no hint that Congress intended to regulate the practice of law, the Commission insisted that it was empowered to apply its rules to the legal profession.  This Court held that the Commission's interpretation violated its statutory mandate, was entitled to no deference, and was unreasonable in any event.

In this case, the Commission is attempting again to foist a regulatory scheme on lawyers without the slightest indication that Congress intended or desired such a result.  Here, the authorizing statute is the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"), which in relevant part seeks to prevent identity theft involving "financial institutions" and "creditors" in

the banking and credit industries. As with the GLBA, nothing in the FACT Act suggests that Congress thought these technical terms encompass lawyers or indicates a congressional desire to regulate the practice of law. Similarly, during the Commission's rulemaking process that eventually resulted in the "Red Flags Rule" at issue here—which imposes substantial obligations to detect, combat, and report signs of identity theft—the Commission never suggested that lawyers engaged in the practice of law qualify as "creditors" covered by the Rule. It was not until over one year *after* the Red Flags Rule was finalized, when the Commission issued an amended enforcement policy, that the Commission announced for the first time its position that the Rule applied to lawyers.

The Commission's position here is unsustainable under the law of this Circuit. In *ABA-GLBA*, the Court announced a bright-line rule that the Commission may not regulate the practice of law unless Congress provides it with an "unmistakably clear" grant of statutory authority to do so. The FACT Act contains no grant of authority that even remotely meets this standard. To the contrary, the text, legislative history, and legislative purpose of the FACT Act all point to the conclusion that Congress sought to regulate the banking and credit industries, not lawyers.

The term "creditor" is defined in the statute as someone who regularly issues "credit," which in turn is defined as the "right" granted to a debtor to defer payment, a right that credit card companies and certain other businesses give to their debtors. The Commission, however, takes the view that because lawyers regularly do not require immediate payment as services are rendered, they somehow become creditors subject to the Rule. Indeed, according to the Commission's interpretation, the simple act of billing clients by monthly invoice—a standard billing model—amounts to the extension of credit and transforms lawyers into statutory "creditors." That, however, is a plainly erroneous distortion of the statute. The word "right" does not mean permission, and allowing a client to pay via monthly invoice is not the same as granting an entitlement to do so.

Acting on behalf of its nearly 400,000 members, the American Bar Association ("ABA") brought suit to block application of the Commission's amended enforcement policy to lawyers, arguing that the Commission had exceeded its statutory authority. In an extensive opinion, the United States District Court for the District of Columbia (Reggie B. Walton, J.) agreed, holding that the FACT Act and the Red Flags Rule do not apply to lawyers and that the enforcement policy is based on a mistaken interpretation of the

statute.  For the reasons given below, this Court should affirm the district court's well-reasoned decision.

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the district court correctly held that, under the law of this Circuit as established by *ABA-GLBA*, the Commission lacks the statutory authority to apply the Red Flags Rule to lawyers engaged in the practice of law because the FACT Act does not contain an unmistakably clear grant of statutory authority to support the Commission's action.

2.     Whether the district court correctly held that, even if an unmistakably clear grant of statutory authority were not required, the plain language of the FACT Act demonstrates that the Commission lacks the statutory authority to apply the Red Flags Rule to lawyers engaged in the practice of law.

3.     Whether the district court correctly held that, even if the FACT Act is ambiguous, the Commission's interpretation of the FACT Act as applying to lawyers engaged in the practice of law is unreasonable.

## PERTINENT STATUTES AND REGULATIONS

Except for portions of 12 C.F.R. pt. 202, which are reproduced in the addendum to this brief, all statutes and regulations relevant to this appeal are found in the addendum to the Commission's opening brief.

## STATEMENT OF FACTS

### A.     Statutory Background

In 2003, Congress enacted the FACT Act to address the problem of identity theft in the banking and credit industries.  The FACT Act directed the Commission and certain other agencies to "establish and maintain guidelines for use by each financial institution and each creditor regarding identity theft with respect to account holders at, or customers of, such entities, and update such guidelines as often as necessary."  15 U.S.C. § 1681m(e)(1)(A).  The Commission and its sister agencies were also instructed to "prescribe regulations requiring each financial institution and each creditor to establish reasonable policies and procedures for implementing" the foregoing guidelines and "to identify possible risks to account holders or customers or to the safety and soundness of the institution or customers." § 1681m(e)(1)(B).  The agencies were given the ability to enforce their identity-theft guidelines and

regulations by seeking injunctive relief and civil monetary penalties. § 1681m(h)(8)(B).

The FACT Act incorporates by reference the definitions of "creditor" and "credit" found in the Equal Credit Opportunity Act ("ECO Act"). § 1681a(r)(5). Since it was first enacted in 1974, the ECO Act has defined the word "creditor" as "any person who *regularly* extends, renews, or continues *credit*; any person who *regularly* arranges for the extension, renewal, or continuation of *credit*; or any assignee of an original creditor who participates in the decision to extend, renew, or continue *credit*." § 1691a(e) (emphases added). In turn, the ECO Act defines the word "credit" as the "*right* granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." § 1691a(d) (emphasis added). Nothing in the plain language of the FACT Act or the ECO Act suggests that lawyers engaged in the practice of law are "creditor[s]."

## B.    Regulatory Background

### 1.    The Red Flags Rule

On November 9, 2007, the Commission and its sister agencies issued a final rule to implement the FACT Act, with an effective date of January 1,

2008, and a "mandatory compliance date" of November 1, 2008. *See* Final Rule, Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 72 Fed. Reg. 63,718 (Nov. 9, 2007), JA 46 (the "Red Flags Rule").

The Red Flags Rule imposes a set of administrative obligations on every financial institution and creditor subject to its coverage. The principal requirement is to develop and implement a written "Identity Theft Prevention Program" that is designed to "detect, prevent, and mitigate identity theft" with respect to any customer account that involves the extension of credit. 16 C.F.R. § 681.1(d)(1).[1] That Identity Theft Prevention Program must contain individualized policies and procedures to enable each financial institution or creditor to identify relevant "Red Flags" for its customer accounts, defined as a "pattern, practice, or specific activity that indicates the possible existence of identity theft," § 681.1(b)(9), (d)(2)(i), and then to detect and respond appropriately to them, § 681.1(d)(2)(iii). For example, an appro-

---

[1]    The portion of the Red Flags Rule at issue in this appeal was originally codified at 16 C.F.R. § 681.2. *See* Red Flags Rule, 72 Fed. Reg. at 63,772, JA 66. However, it has since been recodified at 16 C.F.R. § 681.1. *See* Technical Corrections, Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 74 Fed. Reg. 22,639, 22,645 (May 14, 2009), JA 81.

priate Identity Theft Prevention Program would include checking government-issued identification cards for new customers, monitoring customer activity for warning signs that identity theft may be taking place, modifying procedures where Red Flags have been detected, and reporting any incidents of identity theft to law enforcement agencies. *See* 16 C.F.R. pt. 681, app. A, ¶¶ III-IV.  The program must be updated periodically to reflect changes in risks to customers posed by identity theft.    16 C.F.R. § 681.1(d)(2).  The Red Flags Rule also requires the involvement of the board of directors or senior management of the covered entity, § 681.1(e)(1)-(2), the training of staff, § 681.1(e)(3), and the preparation of periodic reports to monitor compliance, 16 C.F.R. pt. 681, app. A, ¶ VI(b).

The Red Flags Rule follows the FACT Act in providing that "financial institutions" and "creditors" are subject to its provisions.    16 C.F.R. § 681.1(a).   Both are defined in the same way as in the FACT Act. § 681.1(b)(4), (5).  The regulatory definition of "creditor," however, also contains a representative list of such entities, which "includes lenders such as banks, finance companies, automobile dealers, mortgage brokers, utility companies, and telecommunications companies." § 681.1(b)(5).  Lawyers are

absent from that list and are not mentioned anywhere else in the Red Flags Rule.

### 2. The Commission's First Delay And Its Original Enforcement Policy

Ten days before the mandatory compliance date of November 1, 2008, the Commission issued a press release announcing that it was suspending enforcement of the Red Flags Rule until May 1, 2009, in order to "give creditors and financial institutions additional time in which to develop and implement written identity theft prevention programs." Press Release, FTC Will Grant Six-Month Delay of Enforcement of 'Red Flags' Rule Requiring Creditors and Financial Institutions to Have Identity Theft Prevention Programs (Oct. 22, 2008), JA 70. Also on October 22, 2008, the Commission issued a two-page document entitled "FTC Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.2," JA 72-73 (the "Original Enforcement Policy"). Neither the October 22, 2008 press release nor the Original Enforcement Policy provided any indication that the Commission believed lawyers engaged in the practice of law fell within the definition of "creditors."

### 3. The Commission's Second Delay And Its Extended Enforcement Policy

On April 30, 2009, the Commission issued another press release announcing that it was extending the Red Flags Rule's mandatory compliance date until August 1, 2009. *See* Press Release, FTC Will Grant Three-Month Delay of Enforcement of 'Red Flags' Rule Requiring Creditors and Financial Institutions to Adopt Identity Theft Prevention Programs (Apr. 30, 2009), JA 74. For the first time, however, in describing the "entities" that are subject to the Red Flags Rule, the Commission departed from the definitions contained in the FACT Act and the Red Flags Rule. According to the press release, the definition of "creditor" includes "all entities that regularly *permit* deferred payments for goods or services." *Id.* (emphasis added). The press release also offered a new list of the types of entities supposedly subject to the Red Flags Rule, which included "businesses that provide services and bill later, including many *lawyers*, doctors, and other professionals." *Id.* (emphasis added).

On the same day, the Commission replaced its Original Enforcement Policy with a three-page document entitled "FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1," JA 76-78 (the "Extended Enforcement Policy"). The Extended Enforcement Policy repeated

the press release's assertion that lawyers engaged in the practice of law may be "creditor[s]" subject to the Red Flags Rule. In a footnote, the Commission elaborated on its interpretation of the meaning of the statutory term "creditor," stating:

> In [the FACT Act], Congress imported the definition of creditor from the [ECO Act] . . . . This definition covers all entities that regularly *permit* deferred payments for goods or services. The definition thus has a broad scope and may include entities that have not in the past considered themselves to be creditors. For example, creditors under the [ECO Act] include professionals, such as *lawyers* or health care providers, who bill their clients after services are rendered. Similarly, a retailer or service provider that, on a regular basis, *allows* its customers to make purchases or obtain services and then bills them for payment at the end of each month would be a creditor under the [ECO Act].

Extended Enforcement Policy at 1 n.3, JA 76 (emphases added).

### 4. The Commission's Third Delay And Its Frequently Asked Questions

Three days before the Red Flags Rule's mandatory compliance date of August 1, 2009, the Commission issued yet another press release delaying enforcement of the Red Flags Rule until November 1, 2009. *See* Press Release, FTC Announces Expanded Business Education Campaign on 'Red Flags' Rule (July 29, 2009), JA 93. That press release, in turn, referenced a series of frequently asked questions ("FAQs") that confirmed the Commission's new interpretation that lawyers engaged in the practice of law are

- 11 -

"creditor[s]" required to comply with the Red Flags Rule. According to the FAQs: "Under the [Red Flags] Rule, the definition of 'creditor' is broad, and includes businesses or organizations that regularly provide goods or services first and *allow* customers to pay later. . . . Examples of groups that may fall within this definition are utilities, health care providers, *lawyers*, accountants, and other professionals, and telecommunications companies." FAQs ¶ B.1, JA 84 (emphases added).

The Commission's FAQs drew further distinctions among lawyers depending on their method of billing. In contrast to billing by monthly invoice, which the Extended Enforcement Policy asserted created a credit relationship, the Commission's FAQs asserted that the use of retainers and contingency-fee arrangements did not create a credit relationship. *See id.* ¶ B.5-.6, JA 85.

## C.    District Court Proceedings

With the Commission scheduled to begin enforcing the Red Flags Rule against lawyers on November 1, 2009, the ABA commenced this action in the United States District Court for the District of Columbia by filing a three-count complaint against the Commission on August 27, 2009. *See* Compl., JA 6-25. As is relevant here, Count I of the ABA's complaint alleged that the

Commission's proposed application of the Red Flags Rule to lawyers exceeded the Commission's statutory authority.  Compl. ¶¶ 54-60, JA 22-23. Among other things, the complaint asked the district court to permanently enjoin the Commission from implementing the Red Flags Rule in any manner that included lawyers engaged in the practice of law.  Compl. at 19, JA 24.[2]

The ABA later moved for summary judgment on Count I of its complaint, arguing that the Commission had exceeded its statutory authority.  In a detailed decision, the district court granted summary judgment for the ABA.  *See* JA 177-216.

At the outset, the district court recognized that *ABA-GLBA*'s clear-statement test set the standard for evaluating the Commission's action here. Judged against that standard, the district court held that "[e]ven a cursory review of the language of [the FACT Act and the ECO Act] and the purposes underlying their enactment leads the Court to the conclusion that it was not

---

[2]    The ABA's complaint also alleged that the Commission's proposed application of the Red Flags Rule to lawyers was arbitrary and capricious, Compl. ¶¶ 61-64, JA 23-24 (Count II), and asserted an independent claim for declaratory relief, Compl. ¶¶ 65-67, JA 24 (Count III).  The ABA voluntarily dismissed those counts without prejudice to their renewal depending on the outcome of this appeal.  JA 218.

the unambiguously expressed intent of Congress . . . to bring attorneys
within the purview of the FACT Act and thus subject them to regulation by
the Commission's Red Flags Rule." JA 190 (quotations and citation omitted).
The district court continued: "Plainly, neither the FACT Act nor the ECO
Act contains an 'unmistakably clear' grant of statutory authority allowing the
Commission's venture into the regulation of the practice of law," given the
historical prerogative of the States to regulate the practice of law. *Id.* (quot-
ing *ABA-GLBA*, 430 F.3d at 471-72).

   The district court then undertook to review the text, structure, and
purpose of the FACT Act. The district court found three conclusions to be
"self-evident," all of which signaled a complete absence of congressional in-
tent to regulate lawyers. JA 192. First, the larger context of the FACT Act
was concerned with identity theft in the credit industry, rather than all pos-
sible types of identity theft. The statute's use of terms specific to the bank-
ing and lending industries, and even the name of the statute itself—the Fair
and Accurate *Credit Transactions* Act—all indicated a narrower focus than
the Commission presumed. JA 192.

   Second, the "targeted population the FACT Act identifies"—account
holders and customers—"does not correlate with the regulation of attor-

neys." JA 192. "Credit applications, appraisal reports, account holders and customers are all concepts foreign to the practice of law, not squarely falling within the universe of terms used to describe participants in the legal profession or the types of activities conducted by attorneys . . . ." JA 192-93. As the district court observed, the fact that Congress itself is comprised of many members who are themselves attorneys suggests that if Congress intended to regulate attorneys and their billing practices, "it would have used the appropriate terminology to denote that intent and not hidden it in a statute expressly targeted at the credit industry." JA 193-94.

Third, the "definitions of the statutory language do not apply to attorneys." JA 194. The district court emphasized that the statutory definition of "credit" requires that a debtor be given the "right" to defer payment, a concept that does not apply to the legal profession generally. JA 194. Furthermore, the Commission's assertion that lawyers "regularly" extend credit was unsupported by either legislative or administrative findings. JA 194. Among other things, the Commission had "not identified anything in the legislative history—not even a floor statement by one member of Congress—where the problem of identity theft in the legal profession was addressed, or in the rulemaking record process where even one attorney either commented on

- 15 -

the Rule on behalf of the legal profession or questioned whether the Rule applied to attorneys." JA 195.

Turning away from the statute itself, the district court next rejected the other sources of legal authority on which the Commission relied for its regulation of attorneys under the FACT Act. JA 196. For example, the district court rejected as wholly unpersuasive the Commission's reliance on a 1985 safe-harbor interpretation of a regulation promulgated under the ECO Act by the staff of the Federal Reserve Board. The district court also did not accept the Commission's argument that when Congress enacted the FACT Act in 2003, it was aware of and thereby acquiesced in the Federal Reserve Board's staff interpretation. JA 199. The Commission had cited no evidence that Congress actually considered the Federal Reserve Board's staff interpretation when enacting the FACT Act, evidence that the court found necessary to support a congressional-acquiescence argument under the law of this Circuit. JA 199 (citing *Koszola v. FDIC*, 393 F.3d 1294, 1299 (D.C. Cir. 2005)).

In an extremely detailed and technical analysis, the district court also dismantled the Commission's assertion that an arrangement whereby a lawyer bills by monthly invoice creates a credit relationship within the purview

of the ECO Act. JA 200-03. This, the district court held, was "clearly not what was intended by Congress by its use of the term credit in the ECO Act and its subsequent inclusion of the term in the FACT Act," for if this "'proposition were strictly applied . . . countless transactions in which compensation for services is not instantaneous would be characterized as credit transactions.'" JA 203 (quoting *Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18-19 (2d Cir. 1990)) (ellipsis supplied by the district court).

For all these reasons, the court held that the intent of Congress was unambiguous in not granting to the Commission the authority to regulate lawyers. JA 206. But even if it were ambiguous, the court concluded that the Commission's interpretation of the FACT Act was unreasonable. JA 207. Applying the deference standard established by *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the district court found that the Commission's Extended Enforcement Policy did not have the "power to persuade." JA 207.

In doing so, the district court specifically held that the Extended Enforcement Policy's assertion that an attorney's billing by monthly invoice created a credit relationship disregarded the statutory definition of "credit." "To invoice [a] client at the end of each month is not delaying payment or giving a client a *right* to postpone payment," the district court explained. JA

208 (emphasis supplied by the district court).  Moreover, the Extended En-
forcement Policy's use of a monthly billing cycle was "completely arbitrary."
JA 210.  "[C]onsidering that the monthly time period seems to have been
plucked out of thin air," the district court found it particularly troubling that,
at oral argument, the Commission had gone even further, arguing that "any
bill not submitted to a client immediately upon rendering a service and not
paid virtually simultaneously upon its submission creates a debtor-creditor
relationship.  This position is extreme and clearly could not have been a re-
sult anticipated by Congress given the obvious intrusion the Commission's
approach would have into the relationships between attorneys and their cli-
ents."  JA 210-11.

Finally, the district court noted that a "plethora of [ethics] rules al-
ready in existence . . . sufficiently protect the concerns identified by the
Commission."  JA 212.  "These rules make it patently clear that attorneys
are already obligated to conduct themselves in a manner that promotes the
objectives of the Red Flags Rule, and the Commission's position that its
regulation is needed to protect third-parties against identity theft is just not
the case."  JA 212.  The district court was also troubled by the fact that "at no
time in the rulemaking process did the Commission provide any indication

that the definition of creditor was to include attorneys who invoice their clients, so its post-rulemaking interpretation first disclosed on April 30, 2009 (almost a year and a half after the final Rule was issued) came out-of-the-blue." JA 213. Accordingly, the district court found that the Commission's actions were unlawful because the Red Flags Rule "cannot be properly applied to attorneys in the overly broad manner in which the Commission seeks to enforce it." JA 216.

As a result, the district court later entered a final judgment declaring that the Commission exceeded its statutory authority by determining the Red Flags Rule can be applied to lawyers engaged in the practice of law. JA 218. The district court also enjoined the Commission from enforcing the requirements of the Red Flags Rule against lawyers engaged in the practice of law. *Id.* The Commission's appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's judgment was correct and can be affirmed on three independent grounds. First, the district court correctly held that, under the legal standard established by this Court's decision in *ABA-GLBA*, the FACT Act does not contain the "unmistakably clear" grant of statutory authority necessary to support the Commission's action. *ABA-GLBA* instructs that

- 19 -

while Congress may be able to supplant the States' historical role as regulators of the practice of law under certain circumstances if Congress so chooses, this Court will not infer such an extraordinary intent unless Congress speaks with a clear voice, using unambiguous statutory language. Congress did not do so in the form of the FACT Act, focusing instead on the banking and credit industries.  Therefore, application of the bright-line rule established by *ABA-GLBA* demonstrates that the Commission exceeded its statutory authority by attempting to apply the Red Flags Rule to lawyers.

Second, the district court correctly held that, even if the law of this Circuit did not require the Commission to identify an unmistakably clear grant of statutory authority, the plain language of the FACT Act and its legislative purpose demonstrate that Congress did not grant the Commission the authority it wishes to exercise in this case.  The FACT Act's reference to "account holders," "entities," "customers," "consumers," "transaction[s]," and "credit or deposit account[s]"—terms that are not associated with the practice of law—confirms that Congress did not intend to give the Commission the authority to regulate lawyers.  The legislative history and stated congressional purpose of the FACT Act reinforce this conclusion.

- 20 -

Third, the district court correctly held that, even if the FACT Act were ambiguous as to whether Congress intended to give the Commission sweeping new authority to regulate lawyers, the Commission's interpretation of the FACT Act and the ECO Act is unreasonable. The contention that the common practice of monthly billing—or merely allowing a client to defer payment of a legal bill—creates a credit relationship is unsupportable. As numerous courts have held, including the Third Circuit in *Riethman v. Berry*, 287 F.3d 274 (3d Cir. 2002), the statutory definitions of "credit" and "creditor" only apply when a right has been granted to defer payment. The Commission's position also reflects a fundamental misunderstanding of a safe-harbor staff interpretation of a regulation issued by another agency. In addition, by failing to raise it in the district court, the Commission waived its otherwise-meritless argument that the ABA's case must fail because there supposedly exists a "plainly legitimate sweep" of circumstances in which the Red Flags Rule may apply to lawyers.

# ARGUMENT

## I. Under The Well-Established Law Of This Circuit, An "Unmistakably Clear" Grant Of Statutory Authority Is Required Before The Commission May Regulate The Practice Of Law, Which Is Completely Absent From The FACT Act

The law of this Circuit provides that before the Commission may regulate lawyers engaged in the practice of law, Congress must provide it an unmistakably clear grant of statutory authority to do so.  Because the FACT Act contains no such grant, the Commission exceeded its statutory authority by attempting to apply the Red Flags Rule to lawyers.

This Court recently resolved a similar dispute between the parties to this appeal.  *See ABA-GLBA*, 430 F.3d 457.  In 1999, Congress enacted the Gramm-Leach-Bliley Act ("GLBA"), Pub. L. No. 106-102, 113 Stat. 1338.  Among other things, the GLBA contained extensive consumer privacy protections designed to regulate the dissemination of consumers' personal financial information by "financial institution[s]."  The GLBA defined the term "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12."  15 U.S.C. § 6804(a)(1).  The cross-referenced section of Title 12 included institutions that were engaged in certain nonbanking activities considered financial in

nature, and incorporated by reference a regulation offering an extensive list of examples of such financial activities.

Like the FACT Act, the GLBA gave several agencies authority to establish consumer privacy standards for the financial institutions subject to their respective jurisdictions, including the Commission.  § 6805(a)(7).  Nothing in Congress's grant of rulemaking power, however, included any authority to expand or alter the GLBA's definition of the parties covered by the statute.  After regulations implementing the GLBA were promulgated—again revealing no intention to govern the practice of law—the Commission asserted an intention to consider lawyers under certain circumstances to be "financial institutions" subject to those regulations.  The ABA and the New York State Bar Association sued the Commission for declaratory and injunctive relief, and the district court (Walton, J.) held that the Commission had exceeded its statutory authority by interpreting the GLBA to apply to lawyers engaged in the practice of law.  *See N.Y. State Bar Ass'n v. FTC*, Civil Action No. 02-810 (RBW), 2004 WL 964173, at *3 (D.D.C. Apr. 30, 2004).

This Court affirmed.  *See ABA-GLBA*, 430 F.3d 457.  Assuming for purposes of decision that the Commission's interpretation of the GLBA was entitled to heightened deference under *Chevron U.S.A., Inc. v. Natural Re-*

*sources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court rejected the argument that Congress had explicitly or implicitly delegated to the Commission the authority to regulate lawyers engaged in the practice of law. *ABA-GLBA*, 430 F.3d at 471.  Citing the Supreme Court's admonition that "[Congress] does not . . . hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), the Court explained that, in order to allow the Commission to regulate lawyers based only on the statutory grant of authority over financial institutions, the Court would have to conclude that Congress "not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence." *ABA-GLBA*, 430 F.3d at 467.

The Court further held that the Commission was authorized to apply regulations to practicing lawyers only when Congress so provided in a clear statement.  The Court explained that it is well established that federal law "'may not be interpreted to reach into areas of State sovereignty unless the language of the federal law compels the intrusion.'"  *Id.* (quoting *City of Abilene v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999)).  Throughout the history of the

United States, the regulation of the practice of law has been the province of the States.  *Id.*  Accordingly, the Court held, if Congress intends to alter this usual constitutional balance between the States and the Federal Government, "it must make its intention to do so *unmistakably clear in the language of the statute.*"  *Id.* at 471-72 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)) (internal quotations omitted; emphasis added). Because it was "abundantly plain" that Congress had not expressed any intention to have the practice of law regulated under the GLBA, the Court held that the Commission's interpretation that extended the term "financial institution" to include practicing lawyers was unreasonable.  *Id.* at 472.

Here, the Commission does not contend that lawyers engaged in the practice of law are "financial institution[s]" subject to the Red Flags Rule. Instead, the agency has selected a different "mousehole," arguing that lawyers are "creditor[s]" subject to the Red Flags Rule if they bill clients at the end of each month.  Extended Enforcement Policy at 1 n.3, JA 76.  But that misses the point.  Neither the FACT Act nor the ECO Act contains any "unmistakably clear" grant of authority to the Commission to regulate the practice of law.  There is no language in either statute that refers to lawyers or law firms or otherwise remotely passes the *ABA-GLBA* test.  To the con-

trary, the terms those statutes employ are not suggestive of lawyers at all. *See* Point II.A, *infra*. Accordingly, the Commission has exceeded its authority in this case as plainly as it did in *ABA-GLBA*.

The Commission asserts many case-specific reasons why *ABA-GLBA* should not control here. None is relevant because *ABA-GLBA* established a bright-line rule for finding authorization to regulate lawyers based on the language of the authorizing statute. In any event, the claimed differences between the two cases are more apparent than real.

The Commission argues that while *ABA-GLBA* involved a situation where the Commission had given an inappropriately broad interpretation to the statutory term "financial institution," here the word "creditor" naturally encompasses lawyers. But the Commission ignores the fact—pervasively throughout its brief—that "creditor" is defined by reference to the concept of "credit," which has been assigned a precise statutory meaning. Indeed, "credit" (and hence "creditor") is a term of art in the FACT Act in the same manner that "financial institution" was in the GLBA. The Commission also ignores the legal principle established by *ABA-GLBA*, which is not whether Congress supposedly intended the words it chose to be read "expansive[ly]." Comm'n Br. at 34. Rather, the test is whether Congress spoke with unmis-

takable clarity about covering lawyers. *ABA-GLBA*, 430 F.3d at 472. Here, there is no question that it did not.

The Commission also contends that, "unlike the situation addressed in *ABA-GLBA*, here there is no incorporation of a particularly detailed regulatory scheme to determine if a lawyer is covered." Comm'n Br. at 36. But, in fact, the Commission is relying on a "detailed regulatory scheme" to make precisely that determination. As discussed below, the Commission's interpretation embedded in the Extended Enforcement Policy is based on the Federal Reserve Board staff's interpretation of a regulation issued by the Board under the ECO Act. *See id.* That regulation does not interpret the ECO Act's definition of "creditor" or "credit." Instead, it lists "classes of transactions" that are exempt from certain procedural requirements of the main regulation. *See* 12 C.F.R. § 202.3. Moreover, the staff interpretation provides nothing more than a safe harbor, the violation of which has no independent legal significance. Therefore, putting aside the fact that the Commission's reliance on the safe harbor is patently erroneous (*see* Section III.B, *infra*), the Commission is attempting to rely on the same type of attenuated argument this Court rejected in *ABA-GLBA*.

Finally, the Court should reject the Commission's assertion that *ABA-GLBA* does not control this case because the Red Flags Rule supposedly "does not intrude or conflict with existing state regulation of the attorney-client relationship or otherwise intrude into a core state function." Comm'n Br. at 37. The Commission claims that the Red Flags Rule is designed to protect "non-client victims" of identity theft. *Id.* But as the district court correctly held, a "plethora of rules already in existence" addresses the Commission's concerns. JA 212; *see, e.g.*, Model Rules of Prof'l Conduct R. 1.2(d) (forbidding a lawyer from counseling a client to "engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent"), R. 1.6(b)(2) (allowing a lawyer to reveal otherwise-confidential information "to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services"), R. 4.1 (explaining that a lawyer may not knowingly "make a false statement of material fact or law to a third person" or "fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client"), R. 8.4(c) (prohibiting a lawyer from engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation").

The Commission's assertion that there is no "comprehensive set" of ethical rules specifically protecting non-client identity theft, Comm'n Br. at 37-38, ignores the fact that existing ethical rules would control whenever attorney representations involve any type of identity theft. Accordingly, as the district court correctly held, application of the Red Flags Rule would intrude into an area traditionally reserved for state regulation. *See* JA 214.

Furthermore, the absence of specific ethical rules regarding identity theft shows that the Commission is attempting to regulate a profession that does not have the problem Congress sought to remedy. This is demonstrated even in the examples used by the Commission in asserting that "there have been a number of reported instances in which attorneys have failed to verify the identity of imposter clients." Comm'n Br. at 38 n.26. The Commission can only identify a handful of isolated instances over a span of 20 years. In each of the two lead cases the Commission cites, a lawyer failed to check the identification of third parties who were not the lawyer's client prior to assisting them in transferring property of non-clients to the lawyer's client. *See Trapasso v. Lopez*, No. 139377, 1995 WL 17215792, at *2 (Mass. Land Ct. Feb. 16, 1995); *Christiano v. Bonesteel*, No. CV 89 0104622, 1991 WL 162160, at *3 (Conn. Super. Ct. Aug. 16, 1991). Hence, the Red Flags Rule would not

have covered either situation. Similarly, the 2009 newspaper article cited by the Commission explains that any problems in these cases would have been avoided if the attorneys in question had simply followed existing notarization requirements. *See* Douglas S. Malan, *Imposter Clients Land Attorneys In Hot Water*, Conn. Law Tribune (Sept. 14, 2009). As for the 2010 newspaper article cited by the Commission, it cites the district court's decision in this case as showing that existing ethics rules already address the Commission's concerns. *See Confirming Clients' Identities*, Conn. Law Tribune (May 10, 2010).

Moreover, by focusing on "non-client victims," the Commission avoids addressing the very tangible adverse impact the Red Flags Rule would have on actual clients. As the district court explained, application of the Rule would "create[] another barrier for attorneys to build the level of trust necessary for clients to feel that they can openly communicate with their attorneys." JA 215. This, the district court concluded, would be an especially grave problem in the criminal law context. *Id.* Thus, contrary to the Commission's argument, its interpretation would severely "intrude [into] state regulation of the attorney-client relationship" and "into a core state function." Comm'n Br. at 37. While this Court has not foreclosed the possibility

that Congress could intervene in such a manner, *ABA-GLBA* instructs that it is not reasonable for an agency to decide that Congress has chosen such an approach in the absence of clear statutory language.  430 F.3d at 472.

## II.  The Plain Language Of The FACT Act Demonstrates That Congress Did Not Delegate To The Commission The Authority To Regulate Lawyers Engaged In The Practice Of Law

Even if the law of this Circuit did not require the Commission to identify an unmistakably clear grant of statutory authority to justify its current attempt to impose regulations on the legal profession, the district court's judgment should still be affirmed.

Federal agencies can only act within the authority given them by Congress.  Therefore, as this Court explained in *ABA-GLBA*, the question to be asked "is not whether the statute permits [an] exemption from regulation [for] attorneys, but whether it supports such regulation at all."  430 F.3d at 468.  In making that assessment, the words of a statute "should be read in context, the statute's place in the overall statutory scheme should be considered, and the problem Congress sought to solve should be taken into account."  *PDK Labs. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004) (internal quotations and citation omitted).

The plain language of the FACT Act, while clearly reflecting Congress's intent to cover the banking and credit industries, does not support the Commission's attempted regulation of the legal profession. For example, the very regulations that the Commission was directed to promulgate were meant to target "identity theft with respect to *account holders* at, or *customers* of, such *entities*." 15 U.S.C. § 1681m(e)(1)(A) (emphases added); *see also* § 1681m(e)(1)(B) (requiring the Commission to establish guidelines related to "account holders" and "customers"). Congress also instructed the Commission to "consider including reasonable guidelines providing that when a *transaction* occurs with respect to a *credit or deposit account* that has been inactive for more than 2 years, the creditor or financial institution shall follow reasonable policies and procedures that provide for notice to be given to a *consumer* in a manner reasonably designed to reduce the likelihood of identity theft with respect to such *account*." § 1681m(e)(2)(B) (emphases added).

The FACT Act's reference to "account holders," "entities," "customers," "consumers," "transaction[s]," and "credit or deposit account[s]"—terms that Congress would not naturally associate with the practice of law—evidences that, as the district court correctly held, the "intent of Congress is unambiguous: it did not grant to the Commission the broad authority to ex-

ercise regulatory control over attorneys pursuant to the FACT Act, and accordingly the Red Flags Rule similarly cannot be properly promulgated in such a broad manner." JA 206.

The Commission contends that there is "nothing incongruous or inconsistent" about applying the statutory terms "account holders" and "customers" to lawyers "in the context of their billing arrangements with their clients." Comm'n Br. at 25. As the sole basis for its assertion, the Commission cites a dictionary definition for "client" as including a "customer or patron." *Id.* (citation omitted). The principal definition given by that same dictionary, however, explains that the most common usage of the word "client" is much narrower in scope, meaning "[o]ne for whom professional services are rendered, as by a lawyer." American Heritage Dictionary 281 (2d College ed. 1982). When Congress "employs a term susceptible of several meanings, as many terms are, it scarcely follows that Congress has authorized an agency to choose *any* one of those meanings." *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). Instead, an agency must still evaluate the words of a statute in context, considering the problem Congress sought to address. *Id.*

The problem Congress sought to address by enacting the FACT Act supports the conclusion that the Commission has attempted to occupy an

area well outside the boundaries of its statutory authority. As explained by the Conference Committee report that accompanied the FACT Act, Congress was concerned that the "national credit markets [had] undergone significant change" as a result of technological innovations. H.R. Rep. No. 108-396, at 65 (2003) (Conf. Rep.), *as reprinted in* 2003 U.S.C.C.A.N. 1753, 1754. "Mortgage financing that once took weeks now takes hours," and "[c]onsumer credit can be obtained at the point of sale for major items like automobiles." *Id.* Such technological innovations had one major drawback: namely, the "free flow [of] information ha[d] enabled the explosive growth of a new crime—identity theft." *Id.* The Conference Committee explained that various congressional committees had developed "comprehensive hearing records" regarding the growth of identity theft and the "havoc it visits upon the lives of its victims." *Id.* at 65-66, *as reprinted in* 2003 U.S.C.C.A.N. at 1754. Tellingly, the Commission cites nothing in the FACT Act's legislative history that even remotely suggests Congress was concerned, or even informed about, any purported problem of identity theft in the attorney-client context. As the district court found, any such problem is "only . . . theoretical." JA 212.

Instead, the Commission principally relies on three Supreme Court decisions to support its contention that the Commission has merely followed Congress's orders by seeking to regulate lawyers as creditors under the FACT Act. *See* Comm'n Br. at 28-32. Even a cursory examination of these decisions reveals they are readily distinguishable from this case.

In *Heintz v. Jenkins*, 514 U.S. 291 (1995), the Supreme Court considered whether a lawyer who brought litigation to collect a debt owed to his client was a "debt collector" within the meaning of a federal statute that defined the term as "any person . . . who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The Court cited two reasons for finding that a lawyer bringing litigation on behalf of a lender-client could qualify as a "debt collector." First, the Court explained that "[i]n ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts." *Heintz*, 514 U.S. at 294 (citation omitted). Second, the Court noted that the original version of the statute in question expressly exempted "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client." *Id.* (internal quotation omitted). However, a subsequent

Congress deleted the attorney-at-law exemption, thereby indicating Congress intended that lawyers suing on behalf of lender-clients could thereafter be included within the definition of "debt collector[s]." *See id.*

This case is markedly different from *Heintz*. In ordinary English, no one would say that a lawyer engaged in the practice of law has extended "credit" simply because the lawyer bills a client at the end of the month and does not require immediate payment following the receipt of services. Additionally, neither the FACT Act nor the ECO Act ever contained a lawyer exemption that was subsequently repealed by Congress.[3]

The Commission also mistakenly relies on *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975). Comm'n Br. at 30-31. There, the Court considered whether to imply a "learned professions" exemption to liability under § 1 of

---

[3]    The Commission's brief notes (at 14 n.17) that Congress is considering legislation that would exempt certain small businesses from complying with the Red Flags Rule, including a "legal practice with 20 or fewer employees." H.R. 3763, 111th Cong. § 1(a) (2010); S. 3416, 111th Cong. § 1(a) (2010). The fact that such legislation is currently pending does not affect the answer to the central legal question presented by this appeal, which asks whether, in 2003, Congress gave the Commission the authority to regulate lawyers under the FACT Act. *See United States ex rel. Long v. SCS Bus. & Technical Inst., Inc.*, 173 F.3d 870, 878 (D.C. Cir. 1999) (rejecting reliance on post-enactment legislative history, which was "perhaps better referred to as 'legislative future'").

the Sherman Act, 15 U.S.C. § 1, which creates criminal and civil liability for "[e]very person" who engages in any combination or conspiracy "in restraint of trade or commerce."  The state bar association in *Goldfarb* defended the legality of a minimum-fee schedule for the examination of land titles by arguing that the practice of law was not "trade or commerce."  *See* 421 U.S. at 786.  In rejecting that argument, the Court explained that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose."  *Id.* at 787.  "Whatever else it may be," the Court explained, "the examination of a land title is a service; the exchange of such a service for money is 'commerce' in the most common usage of that word."  *Id.* at 787-88.

Here, by contrast, it cannot be said that Congress "intended to strike as broadly as it could" simply by using the terms "creditor" and "credit."  As the district court found, there is nothing in the FACT Act's legislative history—not even a floor statement by one member of Congress—where a problem of identity theft in the legal profession was raised.  JA 195.  Nor can it be said that the traditional billing practice whereby lawyers bill clients for services rendered instead of demanding immediate payment is credit in the "most common usage of the word."

Finally, the Commission relies on a Supreme Court decision issued a few months after the district court's ruling in this case. *See* Comm'n Br. at 31. In *Milavetz, Gallop & Milavetz v. United States*, 130 S. Ct. 1324 (2010), the Court considered whether attorneys fell within a bankruptcy statute's use of the term "debt relief agency," which was defined as "any person who provides any bankruptcy assistance to an assisted person in return for payment." According to the Court, it was clear that "bankruptcy assistance" included several services commonly performed by attorneys. Indeed, the Court held, "some forms of bankruptcy assistance, including the 'provi[sion of] legal representation with respect to a case or proceeding,' . . . may be provided *only* by attorneys." *Id.* at 1332 (alterations supplied by Court; emphasis added; citations omitted). The statute also included a proviso explaining that it should not be "'deemed to limit or curtail' States' authority to 'determine and enforce qualifications for the practice of law,'" a provision the Court believed would only be necessary if Congress intended the term "debt relief agency" to include attorneys. *Id.* (citations omitted).

Like *Heintz* and *Goldfarb*, *Milavetz* is clearly distinguishable from this case. Unlike the bankruptcy statute at issue in *Milavetz*, the statutory definitions of "creditor" and "credit" do not include several services commonly

performed by attorneys, let alone services that can *only* be performed by attorneys. Nor does the FACT Act contain a proviso explaining that it should not be deemed to limit or curtail States' authority to determine and enforce qualifications for the practice of law.[4]

## III. Even If The FACT Act Were Ambiguous, The Commission's Interpretation Would Be Unreasonable

### A. At Most, The Extended Enforcement Policy Is Entitled To *Skidmore* Deference

The Extended Enforcement Policy was issued by the Commission more than one year after the Red Flags Rule was finalized following notice-and-comment rulemaking, and several months after the Commission issued its Original Enforcement Policy. Since it was not the product of notice-and-comment rulemaking itself, the Extended Enforcement Policy is not entitled to any heightened level of deference. *See Gonzales v. Oregon*, 546 U.S. 243, 268 (2006). At most, the Extended Enforcement Policy is "'entitled to re-

---

[4] The other cases the Commission cites without any substantive discussion (Comm'n Br. at 32) are similarly distinguishable because their statutory texts and legislative purposes, unlike here, naturally embraced lawyers or law firms engaged in the practice of law. *See Wyatt v. Cole*, 504 U.S. 158, 168-69 (1992); *Hishon v. King & Spalding*, 467 U.S. 69, 73-74 (1984); *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995); *Kline v. 1st W. Gov't Sec. Inc.*, 24 F.3d 480, 486-87 (3d Cir. 1994); *Foley, Hoag & Eliot*, 229 N.L.R.B. 456 (1977).

spect' only to the extent it has the 'power to persuade.'" *Id.* at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  As the district court correctly held, however, the interpretation of the FACT Act and the ECO Act contained in the Extended Enforcement Policy is unreasonable and should therefore be rejected.  JA 216.

### B.  The Interpretation Contained In The Extended Enforcement Policy Is Unreasonable

As it relates to the legal profession, the linchpin of the Extended Enforcement Policy is the Commission's "allows" reasoning.  Unlike the Red Flags Rule itself, the Extended Enforcement Policy claims that the ECO Act's definition of the word "creditor" includes "all entities that regularly *permit* deferred payments for goods or services," with the result that a "service provider that, on a regular basis, *allows* its customers to make purchases or obtain services and then bills them for payment at the end of each month would be a creditor under the [ECO Act]."  Extended Enforcement Policy at 1 n.3, JA 76 (emphases added); *see also* FAQs ¶ B.1, JA 84 ("Under the [Red Flags] Rule, the definition of 'creditor' is broad, and includes businesses or organizations that regularly provide goods or services first and *allow* customers to pay later.") (emphasis added).  The Commission repeats its "allows" reasoning throughout its brief.  *See, e.g.*, Comm'n Br. at 19 (arguing

- 40 -

there are "many legitimate applications of the Rule to lawyers that plainly involve the extension of credit—such as when the attorney allows the client to pay a bill over the course of many months"), 20 ("[A]ny entity . . . that provides goods or services and regularly permits its customers or clients to pay later, is subject to the identity theft provisions of the Red Flags Rule."), 36 ("[A] lawyer who regularly permits her clients to defer paying their legal bills 'extends . . . credit' under the straightforward meaning of those terms.").

That interpretation, however, contradicts the plain language of the ECO Act's definition of "credit," conflicts with precedent reaffirming that the "right" to defer payment is a central component of the ECO Act's definition of "credit," and reflects a fundamental misunderstanding of a safe-harbor interpretation issued by another agency related to that other agency's regulation interpreting something other than the ECO Act's definition of "credit."

### 1. The Extended Enforcement Policy Disregards The Statutory Definition Of "Credit," Which Requires The "Right" To Defer Payment

The ECO Act's definition of the word "creditor" is built on the statute's definition of the word "credit," which the ECO Act narrowly defines as "the *right* granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer

payment therefor." 15 U.S.C. § 1691a(d) (emphasis added). The standard, dictionary meaning of a right is a legally enforceable power to carry out a given act. *See* Black's Law Dictionary 1436 (9th ed. 2009) (defining "right" as a "legally enforceable claim that another will do or will not do a given act"); American Heritage Dictionary 1062 (2d College ed. 1982) (defining "right" as a "legal claim or title"). Moreover, the statutory definition of "credit" expressly provides that the right to defer payment must be "granted" by the creditor to the debtor. 15 U.S.C. § 1691a(d).

The case law makes clear that a lawyer's failure to insist that a client pay his bills immediately upon the rendering of legal services does not somehow convert their arrangement into a credit relationship subject to the ECO Act. In *Riethman v. Berry*, 287 F.3d 274 (3d Cir. 2002), the Third Circuit specifically considered whether a law firm qualified as a creditor under the ECO Act because it allowed clients to make late payments. The Third Circuit held that doing so did not create a credit relationship. "The hallmark of 'credit' under the [ECO Act] is the *right* of one party to make deferred payment." *Id.* at 277 (emphasis added). No such right is granted to the client merely because the lawyer chooses not to enforce *his* right to prompt payment spelled out in a standard retainer agreement. *Id.* To hold otherwise

would be to disregard "ordinary principles of contract interpretation," according to which an express agreement that makes legal costs due upon receipt of a bill overrides any practice or course of dealing of the parties. *Id.*; *see also Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18 (2d Cir. 1990) (holding that the mere fact that payment is not simultaneous with performance of work does not create a credit relationship).

Other courts follow *Riethman*'s emphasis on the existence of a right to defer payment. *See Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 408 (6th Cir. 1998) (holding that lawyer-defendant was not a "creditor" under the ECO Act simply because he offered to settle preexisting claims against the debtor-plaintiff, explaining that, "[o]therwise, an attorney would be a creditor under the [ECO Act] anytime the attorney offered to settle a case"); *Shaumyan*, 900 F.2d at 18 ("Absent a right to defer payment for a monetary debt, property or services, the [ECO Act] is inapplicable."); *see also Riethman*, 287 F.3d at 277, 279 (citing district court decisions to the same effect and expressly rejecting the cursory analysis of *In re Brazil*, 21 B.R. 333 (Bankr. N.D. Ohio 1982), on which the Commission relies here). Indeed, this very Court has rejected the notion that the ECO Act applied where the

creditor did not grant a "right" to a debtor.  *See Mick's at Penn. Ave., Inc. v. BOD, Inc.*, 389 F.3d 1284, 1289 (D.C. Cir. 2004) (sublease).

The Commission has no effective retort to these decisions.  It acknowledges that *Riethman* held that so long as lawyers draft their retainer agreements to manifest an entitlement to "prompt and full payments," then their failure to enforce such agreements strictly does not create a credit relationship.  Comm'n Br. at 27.  The Commission correctly asserts that *Riethman* disclaimed any holding that "'lawyers are *ipso facto* exempt from the statute.'"  *Id.* (quoting 287 F.3d at 278).  But that presumably was only because broader arguments about the scope of the statute were not before the Third Circuit, which did not need to reach that question.  Even so, the court went out of its way to note that "[i]n view of the statutory purpose underlying the [ECO Act], it seems implausible that Congress intended to cover not only banks and other such financial institutions but also all professions."  287 F.3d at 278.[5]

---

[5]   The Commission is incorrect in its contention that during oral argument on the motion for summary judgment below, counsel for the ABA supposedly admitted that "if attorneys *allowed* their clients to pay for their legal services over time, such an arrangement would amount to the extension of credit."  Comm'n Br. at 49 (citing Hr'g Tr. at 36, JA 136) (emphasis added).  The reality was that in response to a hypothetical question posed by
(continued)

Indeed, the very cases the Commission cites confirm the central importance of whether a "right" has been granted to defer payment. *Barney v. Waldron*, 110 F.3d 1207 (6th Cir. 1997), not only expressly quoted the statutory definition of "credit" that uses the "right" formulation, but specifically held that the plaintiffs in that case did not qualify as applicants for credit because they did not ask for a "right to purchase anything or defer payment." *Id.* at 1209-10; Comm'n Br. at 23. Another case, *Mays v. Buckeye Rural Electric Cooperative, Inc.*, 277 F.3d 873, 876 (6th Cir. 2002), quoted *Barney* and the Second Circuit's decision in *Shaumyan* with approval, both of which confirm the central importance of having a "right" to defer payment.[6]

the district court, counsel explained that if a lawyer "provides services *and* has some kind of extension of credit *and* enters into credit agreements," it would not be "inconceivable" that such an arrangement would technically fall within the statutory definition of "credit." Hr'g Tr. at 36:3-9, JA 136 (emphasis added). Counsel further explained that such an arrangement would be highly unusual. *See id.*

[6] Surprisingly, the Commission itself seems to concede at points that the key question is whether a "right" to defer payment has been granted, *see* Comm'n Br. at 7, 21, 22, 24, while also asserting that the mere allowance of deferral qualifies a service provider as a creditor under the ECO Act, *see id.* at 23. The teaching of *Riethman, Shaumyan,* and other cases is that it is irrelevant whether a provider allows deferral as a matter of grace; the issue

(continued)

Under the principles established by these authorities, the mere fact that there is an inherent lag between the time when legal services are rendered and when they are billed does not mean the lawyer has extended credit to the client within the meaning of the statute.  To hold otherwise would be to mandate "indiscriminate application" of the ECO Act, which is "not appropriate." *Shaumyan*, 900 F.2d at 19.

> **2.    No Deference Should Be Given To The Commission's Mistaken Reliance On A Safe-Harbor Interpretation Issued By The Federal Reserve Board's Staff**

Traced to its origin, the Commission's "allows" reasoning is based on a premise that the Commission did not explain until it opposed the ABA's motion for summary judgment in the district court: namely, the Commission asserts that it is entitled to use a safe-harbor interpretation issued by staff of the Federal Reserve Board ("Board") related to a regulatory term not at issue here—"incidental credit"—as the basis for the Commission's interpretation of the statutory terms "creditor" and "credit."  As the district court correctly held, however, the Commission's reliance on the Board staff's guid-

---

is whether the provider has granted the debtor the power to defer payment in the debtor's sole discretion.

ance reflects a fundamental misunderstanding of the role played by that guidance, as well as the guidance's true meaning. *See* JA 198-203.

The Board's formal regulations implementing the ECO Act are commonly known as "Regulation B." *See* 12 C.F.R. pt. 202. These formal regulations are faithful to the statutory definition of "credit," explaining that credit is "the *right* granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 202.2(j) (emphasis added). The term "creditor," in turn, is defined as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." § 202.2(*l*). As a general matter, all creditors are obligated to abide by Regulation B's substantive and procedural requirements concerning the extension of credit. Regulation B carves out certain classes of transactions, however, that are categorically exempted from most of its procedural requirements. One such subclass is "incidental credit," which refers to certain types of "credit extended to a natural person primarily for personal, family, or household purposes." §§ 202.2(h), 202.3(c)(1).

Since its enactment in 1974, the ECO Act has contained a safe-harbor provision excluding liability for acts done in good-faith reliance on any inter-

pretation issued by the Board. 15 U.S.C. § 1691e(e). In 1985, the Board published staff interpretations of Regulation B as a supplement to its formal regulations in order to provide such regulatory safe harbors. Official Staff Commentary to Regulation B, 50 Fed. Reg. 48,018, 48,024 (Nov. 20, 1985). The Board staff's interpretation of Regulation B's definition of "credit" has always recognized that one must have the "*right* to defer payment of a debt" before a payment arrangement qualifies as credit. 12 C.F.R. pt. 202, supp. I, § 202.2, ¶ 2(j)-1 (emphasis added). In interpreting Regulation B's exemption for "incidental credit," however, the Board staff stated: "If a service provider (such as a hospital, doctor, *lawyer* or retailer) *allows* the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the ["incidental credit" exemption], even though there is no finance charge and no agreement for payment in installments." *Id.* ¶ 3(c)-1 (emphases added).

The Commission argues that its Extended Enforcement Policy is consistent with the Board staff's interpretation of the "incidental credit" exemption. In the Commission's view, that interpretation supports the Commission's conclusion that lawyers who allow clients to defer payment are "creditors." *See* Comm'n Br. at 39. And the Commission claims that the Board

staff's interpretation of the "incidental credit" exemption should be given substantial deference here. *Id.* at 41. But that argument is fundamentally flawed for several reasons.

First, it is highly doubtful that the Board staff had any intention—nor did it have the power—to change the statutory definition of "credit" as a transaction where the debtor has the "right" to defer payment. Not only do the ECO Act and Regulation B expressly recite that definition, but the Board staff's interpretation does so as well. *See* 12 C.F.R. pt. 202, supp. I, § 202.2, ¶ 2(j)-1. In discussing "incidental credit," which is only a subset of credit, the Board staff simply had no basis on which it could have given "incidental credit" a broader definition than the statutory definition of "credit." The most plausible explanation for the staff's use of the word "allows" in connection with incidental credit is that it was merely a short-hand substitute for giving the right to defer payment.

Second, the Commission ignores the critical fact that the Board staff's interpretation only provides a voluntary safe harbor against civil liability. It was not, nor could it be, an attempt to enlarge the definition of "credit" as defined by the ECO Act and Regulation B. *See* 12 C.F.R. pt. 202, supp. I, introduction (explaining that "[g]ood-faith compliance" with the Board staff's

guidance affords protection from civil liability under the ECO Act). An interpretation drafted by agency staff intended to protect an individual who voluntarily follows that interpretation in good faith will deliberately err on the side of overinclusiveness. *See, e.g., Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1270 (D.C. Cir. 2007) (explaining that agency's regulatory safe harbor provided a voluntary means of demonstrating compliance with a statute and that the safe harbor did not establish a binding norm). The Board staff's interpretation thus does not purport to create an actual legal duty contrary to the definition of "credit" found in the ECO Act or Regulation B.

Third, even if the staff's interpretation were in fact an attempt to broaden the statutory definition of "credit," such action would be flatly invalid. An agency does not have the power to disregard a statutory definition, and any such interpretation is automatically unreasonable. *See Chevron*, 467 U.S. at 843. The mere fact that the Board staff interpretation of the "incidental credit" exemption was issued 25 years ago does not insulate it from careful judicial scrutiny. *See* Comm'n Br. at 18, 36, 39. As this Court recently explained in rejecting an agency's statutory interpretation of similar duration: "No matter how consistent its past practice, an agency must still

explain why that practice comports with the governing statute and reasoned decisionmaking . . . .  [N]o amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one."  *S.E. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) (rejecting federal agency's contention that postage costs were wage-related costs under the Medicare Act).

Nothing in the Supreme Court's decision in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980), counsels a contrary result.  According to the Commission, *Milhollin* stands for the proposition that the Board's staff commentary is "dispositive" unless "demonstrably irrational."  Comm'n Br. at 41 (citing 444 U.S. at 565).  Like its reliance on *Heintz*, *Goldfarb* and *Milavetz*, however, the Commission misconstrues *Milhollin*'s holding.

The question in *Milhollin* was whether the Truth in Lending Act ("TILA") and the Board's regulations implementing that statute, otherwise known as "Regulation Z," required the face of a credit agreement to disclose the existence of an acceleration clause (i.e., a clause in a credit agreement accelerating the payment of a debt upon the default of the debtor).  *See* 444 U.S. at 557.  Although the Board staff had consistently construed the statute and regulations as imposing no such uniform requirement, the Ninth Circuit

disagreed and found that not disclosing an acceleration clause on the face of a credit agreement violated the TILA and Regulation Z. *See id.*

In reversing the Ninth Circuit's judgment, the Supreme Court began with an examination of the express language of the TILA and Regulation Z. *See id.* at 560. Only *after* the Court held that the issue of acceleration disclosure was "not governed by clear expression in the statute or regulation" did the Court deem it appropriate to defer to the Board and its staff in determining what resolution the statute implied. *Id.* It is against this backdrop, which the Commission overlooks, that the Court then stated: "Unless demonstrably irrational, Federal Reserve Board staff opinions construing the [TILA] or Regulation [Z] should be dispositive." *Id.* at 565.

Here, in contrast, the issue whether lawyers are creditors under the FACT Act simply because they invoice clients for services rendered *is* governed by "clear expression" in the ECO Act's and Regulation B's definition of "credit," both of which require the rejection of the Commission's "allows" reasoning. Furthermore, in *Milhollin*, the Supreme Court used a staff interpretation to shield a regulated party from liability after a lower court sought to impose liability by disregarding the staff interpretation. In contrast, the Commission attempts to use another agency's safe-harbor inter-

pretation of a regulation other than Regulation B's definition of "credit" in order to *impose* liability. Therefore, the Commission's reliance on *Milhollin* is entirely misplaced.

Finally, the Commission argues that because Congress amended the ECO Act several times since the publication of the staff interpretation of Regulation B's incidental credit exemption without changing the definition of "credit" or "creditor," and then incorporated the ECO Act's statutory definitions into the FACT Act, Congress acquiesced in the staff's interpretation of that exemption. As discussed above, the staff had no authority to enlarge the definitional language of the ECO Act or Regulation B. Additionally, as the Commission itself notes, the doctrine of legislative acquiescence applies only where there is evidence that Congress actually considered an agency's interpretation, and there is no such evidence here. *See* Comm'n Br. at 47 (citing *Koszola v. FDIC*, 393 F.3d 1294, 1299 (D.C. Cir. 2005)). Moreover, under the Commission's own reasoning, the Commission must concede that Congress was also aware of, and acquiesced in, judicial interpretations such as *Riethman* and *Shaumyan*, both of which unambiguously held that the "right" to defer payment is necessary to establish a credit relationship. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (explaining that when "Congress adopts a

new law incorporating sections of a prior law, Congress normally can be pre-sumed to have had knowledge of the interpretation given to the incorporated law" by federal courts of appeals).

## IV. The Court Should Reject The Commission's Modified Facial Challenge Argument

Finally, the Commission contends for the first time on appeal that the ABA's suit "cannot succeed if there is a 'plainly legitimate sweep' of circumstances in which the [Red Flags] Rule may apply." Comm'n Br. at 19 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 459 (2008)). According to the Commission, because the ABA's suit was in the form of a facial challenge to the Red Flags Rule, the district court should have considered "the myriad ways in which lawyers may arrange their billing and collection activities," many of which the Commission claims would create true credit relationships covered by the Rule, even if monthly invoicing does not. Comm'n Br. at 44. It argues that even if the district court found the latter applications of the Rule invalid, it should not have prevented all applications of the Rule against attorneys. However, even if the Commission had not waived this argument by failing to raise it in the district court, the argument itself is meritless.

### A.    The Commission Waived Its "Plainly Legitimate Sweep" Argument By Failing To Raise It In The District Court

"[W]hile review of the grant of summary judgment is *de novo*, this court reviews only those arguments that were made in the district court, absent exceptional circumstances." *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009). In the district court, the Commission argued that, because it believed the ABA's suit was a facial challenge, the ABA had to satisfy the "no set of circumstances" standard for facial constitutional challenges established by *United States v. Salerno*, 481 U.S. 739 (1987). *See* Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 34-35, Doc. No. 11 (Oct. 13, 2009); Hr'g Tr. at 15:7-10, 20:16-19, 30:18-31:1, 48:22-23, JA 115, 120, 130-31, 148. The district court expressly rejected the application of the *Salerno* standard, holding that *Chevron*'s two-step framework governed this case. *See* JA 188. On appeal, the Commission does not press the *Salerno* standard, mentioning it only in a footnote, *see* Comm'n Br. at 46 n.29, which does not preserve that issue for review, *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007).

Instead, the Commission now contends that the district court erred because "there is a 'plainly legitimate sweep' of circumstances in which the [Red Flags] Rule may apply" to lawyers engaged in the practice of law.

Comm'n Br. at 19 (quoting *Washington State Grange*, 552 U.S. at 459). But the Commission never made that argument below, nor are there any exceptional circumstances justifying an exemption from the waiver doctrine here, such as intervening changes in the law or extraordinary situations with the potential for miscarriages of justice. *See Salazar v. District of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010). All of the authorities cited by the Commission in support of its "plainly legitimate sweep" argument were decided well before the Commission issued its Extended Enforcement Policy. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 202 (2008) (plurality); *Washington State Grange*, 552 U.S. at 449; *Washington v. Glucksberg*, 521 U.S. 702, 739-40 (1997) (Stevens, J., concurring in judgments). Accordingly, the Commission has waived this argument. *See Nat'l Ass'n of Mfrs. v. Dep't of Labor*, 159 F.3d 597, 605-07 (D.C. Cir. 1998).

## B.  The Commission's "Plainly Legitimate Sweep" Argument Is Substantively Meritless

Even if the Court were to address the merits of the Commission's new argument, that argument still fails. The "plainly legitimate sweep" doctrine is a creature of First Amendment overbreadth jurisprudence. As explained by Justice Stevens, when a plaintiff brings a facial challenge to a statute on First Amendment grounds, the plaintiff is required to establish that "the

invalid applications of [the] statute '[are] not only . . . real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Glucks-berg*, 521 U.S. at 740 n.7 (Stevens, J., concurring in judgments) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).  In other words, the court must consider the most common situations covered by a statute's plain language and then ask whether the statute's application to a substantial number of those situations would violate the First Amendment.  If the answer is "yes," the statute is facially invalid and the plaintiff need not satisfy the *Salerno* standard or wait to file an as-applied challenge after the statute has been enforced.  The Supreme Court fashioned this "expansive remedy" out of concern that the threat of enforcement of an overbroad law would deter constitutionally protected speech. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

To the ABA's knowledge, neither the Supreme Court nor this Court has ever applied the "plainly legitimate sweep" standard outside the context of facial challenges brought against statutes on constitutional grounds.  Indeed, every single case cited by the Commission arises in that setting. *See, e.g.*, *Crawford*, 553 U.S. at 202; *Washington State Grange*, 552 U.S. at 449. The Commission has identified no authority, and provided no reasons, for applying it outside that singular context.

- 57 -

Even if that standard can be applied in the context of litigation challenging final agency action on statutory-authority grounds, the district court still reached the correct conclusion in this case.  The Commission complains that the district court should not have extrapolated from its view that the Rule could not be applied to lawyers who bill monthly to the conclusion that it was invalid even as applied to the small number of lawyers who, in the Commission's view, create formal credit relationships.  But that is precisely the result of the "plainly legitimate sweep" doctrine here.  The number of lawyers who bill by the month (i.e., the "invalid applications of the Rule") dwarfs the number who formally grant their clients the right to defer payment, as is evidenced by the fact that the Commission never mentioned this atypical billing practice in its Extended Enforcement Policy or the FAQs.  Hence, the Commission cannot succeed under the very standard it advocates.[7]

_____

[7]  The Commission suggests that the district court should not even have considered the nature of monthly billing in this case.  Comm'n Br. at 44.  However, the catalyst for this case was the express statement in the Extended Enforcement Policy that billing by monthly invoice creates a credit relationship between lawyers and their clients.  *See* Extended Enforcement Policy at 1 n.3, JA 76 (arguing that a "service provider that, on a regular basis, allows its customers to make purchases or obtain services and then bills them for payment at the end of each month would be a creditor"); *see also* Answer ¶ 53, Doc. No. 16 (Oct. 30, 2009) (admitting Extended Enforcement Policy constitutes final agency action).  Therefore, the district court did

(continued)

Moreover, the district court was entirely correct to enjoin application of the Red Flags Rule to lawyers engaged in the practice of law. As the district court explained: "The Commission's advocacy for a case-by-case approach . . . would have attorneys guessing as to whether they fall within the purview of the Red Flags Rule. Attorneys should not be exposed to a sea of uncertainty, especially one that hinges to a significant degree on whether a client is capable of paying immediately upon the performance of the attorney's services." JA 201.

Accordingly, even if the Court were to reach the merits of the Commission's "plainly legitimate sweep" argument, that argument should still be rejected.

---

not select monthly billing by happenstance. Instead, the district court properly focused on the logic that the Commission itself offered in defense of its interpretation.

## **CONCLUSION**

For the foregoing reasons and those stated in the district court's well-reasoned opinion, the district court's judgment should be affirmed.

Dated: August 20, 2010    Respectfully submitted,

           PROSKAUER ROSE LLP


       By:  _____/s/ Mark D. Harris_____
           Mark D. Harris
           Kristen J. Mathews
           Rebecca L. Ambrose
           1585 Broadway
           New York, NY 10036-8299
           (212) 969-3000
           mharris@proskauer.com

           James F. Segroves
           Chervonne C. Stevenson
           1001 Pennsylvania Avenue, NW
R. Thomas Howell, Jr.     Suite 400 South
General Counsel       Washington, DC 20004-2533
Patricia J. Larson      (202) 416-6800
Deputy General Counsel
AMERICAN BAR ASSOCIATION  Clifford S. Davidson
321 N. Clark Street     2049 Century Park East, Suite 3200
Chicago, IL 60654-7598   Los Angeles, CA 90067-3206
(312) 988-5215      (310) 284-4584

*Counsel for Plaintiff-Appellee American Bar Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32, the undersigned certifies that the foregoing Brief for Plaintiff-Appellee American Bar Association contains 12,646 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(2). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, roman typeface (14-point Century Expanded) using Microsoft Word 2003.


    /s/ Mark D. Harris    
Mark D. Harris

## CERTIFICATE OF SERVICE

The undersigned certifies that on this twentieth day of August, 2010, he caused the foregoing Brief for Plaintiff-Appellee American Bar Association to be filed using the Court's CM/ECF System, which will serve notice of same upon counsel of record for Defendant-Appellant Federal Trade Commission via electronic mail:

> John F. Daly
> Michael D. Bergman
> FEDERAL TRADE COMMISSION
> 600 Pennsylvania Avenue, NW, Room 580
> Washington, DC 20580
> jdaly@ftc.gov
> mbergman@ftc.gov

The undersigned also certifies that he will cause eight (8) true and correct copies of the brief to be transmitted to the Clerk of this Court by hand-delivery on the twenty-third day of August, 2010. Two (2) true and correct copies of the brief will be transmitted to the above-listed counsel in the same manner.

\_\_\_\_/s/ Mark D. Harris\_\_\_\_
Mark D. Harris

- 62 -

**ADDENDUM**

# <u>ADDENDUM TABLE OF CONTENTS</u>

Page

12 C.F.R. § 202.1 (2010) ……….……….……..………………….…...1a

12 C.F.R. § 202.2 (2010) ………………………….....….…....……….2a

12 C.F.R. § 202.3 (2010) ……………………….…...……….....…….4a

12 C.F.R. pt. 202, supp. I (2010) (excerpt)…………..……....……………...….6a

**Federal Reserve System** §202.1

clearly requires that the bankers' acceptance be secured by a warehouse receipt in order to satisfy the requirements of eligibility, and a written security agreement and a filed financing statement, while desirable, cannot serve as a substitute for a warehouse receipt.

(g) This Interpretation is based on facts that have been presented in regard to field warehousing operations conducted by established, professional field warehouse companies, and it does not necessarily apply to all field warehousing operations. Thus ¶1430 and ¶1440 of the Published Interpretations [1918 BULLETIN 31 and 1918 BULLETIN 862] maintain their validity with regard to corporations formed for the purpose of conducting limited field warehousing operations. Furthermore, the prohibition contained in ¶1435 Published Interpretations [1918 BULLETIN 634] that ''the borrower shall not have access to the premises and shall exercise no control over the goods stored'' retains its validity, except that access for inspection purposes is still permitted under ¶1450 [1926 BULLETIN 666]. The purpose for the acceptance transaction must be proper and cannot be for speculation [¶1400, 1919 BULLETIN 858] or for the purpose of furnishing working capital [¶1405, 1922 BULLETIN 52].

(h) This interpretation suspersedes only the previous ¶1445 of the Published Interpretations [1933 BULLETIN 188], and is not intended to affect any other Board Interpretation regarding field warehousing.

(12 U.S.C. 342 et seq.)

[43 FR 21434, May 18, 1978]

# PART 202—EQUAL CREDIT OPPORTUNITY ACT (REGULATION B)

Sec.

REGULATION B (EQUAL CREDIT OPPORTUNITY)

202.1  Authority, scope and purpose.
202.2  Definitions.
202.3  Limited exceptions for certain classes of transactions.
202.4  General rules.
202.5  Rules concerning requests for information.
202.6  Rules concerning evaluation of applications.
202.7  Rules concerning extensions of credit.
202.8  Special purpose credit programs.
202.9  Notifications.
202.10  Furnishing of credit information.
202.11  Relation to state law.
202.12  Record retention.
202.13  Information for monitoring purposes.
202.14  Rules on providing appraisal reports.
202.15  Incentives for self-testing and self-correction.
202.16  Enforcement, penalties and liabilities.
APPENDIX A TO PART 202—FEDERAL ENFORCEMENT AGENCIES
APPENDIX B TO PART 202—MODEL APPLICATION FORMS
APPENDIX C TO PART 202—SAMPLE NOTIFICATION FORMS
APPENDIX D TO PART 202—ISSUANCE OF STAFF INTERPRETATIONS
SUPPLEMENT I TO PART 202—OFFICIAL STAFF INTERPRETATIONS

AUTHORITY: 15 U.S.C. 1691–1691f.

SOURCE: Reg. B, 68 FR 13161, Mar. 18, 2003, unless otherwise noted.

## §202.1  Authority, scope and purpose.

(a) *Authority and scope.* This regulation is issued by the Board of Governors of the Federal Reserve System pursuant to title VII (Equal Credit Opportunity Act) of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*). Except as otherwise provided herein, this regulation applies to all persons who are creditors, as defined in §202.2(l). Information collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 3501 *et seq.* and have been assigned OMB No. 7100–0201.

(b) *Purpose.* The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); to the fact that all or part of the applicant's income derives from a public assistance program; or to the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The regulation prohibits creditor practices that discriminate on the basis of any of these factors. The regulation also requires creditors to notify applicants of action taken on their applications; to report credit history in the

15

names of both spouses on an account; to retain records of credit applications; to collect information about the applicant's race and other personal characteristics in applications for certain dwelling-related loans; and to provide applicants with copies of appraisal reports used in connection with credit transactions.

### § 202.2  Definitions.

For the purposes of this regulation, unless the context indicates otherwise, the following definitions apply.

(a) *Account* means an extension of credit. When employed in relation to an account, the word use refers only to open-end credit.

(b) *Act* means the Equal Credit Opportunity Act (title VII of the Consumer Credit Protection Act).

(c) *Adverse action.* (1) The term means:

(i) A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered;

(ii) A termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts; or

(iii) A refusal to increase the amount of credit available to an applicant who has made an application for an increase.

(2) The term does not include:

(i) A change in the terms of an account expressly agreed to by an applicant.

(ii) Any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account;

(iii) A refusal or failure to authorize an account transaction at point of sale or loan, except when the refusal is a termination or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts, or when the refusal is a denial of an application for an increase in the amount of credit available under the account;

(iv) A refusal to extend credit because applicable law prohibits the creditor from extending the credit requested; or

(v) A refusal to extend credit because the creditor does not offer the type of credit or credit plan requested.

(3) An action that falls within the definition of both paragraphs (c)(1) and (c)(2) of this section is governed by paragraph (c)(2) of this section.

(d) *Age* refers only to the age of natural persons and means the number of fully elapsed years from the date of an applicant's birth.

(e) *Applicant* means any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers, and similar parties.

(f) *Application* means an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested. The term application does not include the use of an account or line of credit to obtain an amount of credit that is within a previously established credit limit. A *completed application* means an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral). The creditor shall exercise reasonable diligence in obtaining such information.

(g) *Business credit* refers to extensions of credit primarily for business or commercial (including agricultural) purposes, but excluding extensions of credit of the types described in § 202.3(a)–(d).

(h) *Consumer credit* means credit extended to a natural person primarily for personal, family, or household purposes.

**Federal Reserve System**                                          **§ 202.2**

(i) *Contractually liable* means expressly obligated to repay all debts arising on an account by reason of an agreement to that effect.

(j) *Credit* means the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor.

(k) *Credit card* means any card, plate, coupon book, or other single credit device that may be used from time to time to obtain money, property, or services on credit.

(l) *Creditor* means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

(m) *Credit transaction* means every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures).

(n) *Discriminate against an applicant* means to treat an applicant less favorably than other applicants.

(o) *Elderly* means age 62 or older.

(p) *Empirically derived and other credit scoring systems*—(1) *A credit scoring system* is a system that evaluates an applicant's creditworthiness mechanically, based on key attributes of the applicant and aspects of the transaction, and that determines, alone or in conjunction with an evaluation of additional information about the applicant, whether an applicant is deemed creditworthy. To qualify as an *empirically derived, demonstrably and statistically sound, credit scoring system*, the system must be:

(i) Based on data that are derived from an empirical comparison of sample groups or the population of creditworthy and noncreditworthy applicants who applied for credit within a reasonable preceding period of time;

(ii) Developed for the purpose of evaluating the creditworthiness of applicants with respect to the legitimate business interests of the creditor utilizing the system (including, but not limited to, minimizing bad debt losses and operating expenses in accordance with the creditor's business judgment);

(iii) Developed and validated using accepted statistical principles and methodology; and

(iv) Periodically revalidated by the use of appropriate statistical principles and methodology and adjusted as necessary to maintain predictive ability.

(2) A creditor may use an empirically derived, demonstrably and statistically sound, credit scoring system obtained from another person or may obtain credit experience from which to develop such a system. Any such system must satisfy the criteria set forth in paragraph (p)(1)(i) through (iv) of this section; if the creditor is unable during the development process to validate the system based on its own credit experience in accordance with paragraph (p)(1) of this section, the system must be validated when sufficient credit experience becomes available. A system that fails this validity test is no longer an empirically derived, demonstrably and statistically sound, credit scoring system for that creditor.

(q) *Extend credit* and *extension of credit* mean the granting of credit in any form (including, but not limited to, credit granted in addition to any existing credit or credit limit; credit granted pursuant to an open-end credit plan; the refinancing or other renewal of credit, including the issuance of a new credit card in place of an expiring credit card or in substitution for an existing credit card; the consolidation of

17

**3a**

two or more obligations; or the continuance of existing credit without any special effort to collect at or after maturity).

(r) *Good faith* means honesty in fact in the conduct or transaction.

(s) *Inadvertent error* means a mechanical, electronic, or clerical error that a creditor demonstrates was not intentional and occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such errors.

(t) *Judgmental system of evaluating applicants* means any system for evaluating the creditworthiness of an applicant other than an empirically derived, demonstrably and statistically sound, credit scoring system.

(u) *Marital status* means the state of being unmarried, married, or separated, as defined by applicable state law. The term "unmarried" includes persons who are single, divorced, or widowed.

(v) *Negative factor or value*, in relation to the age of elderly applicants, means utilizing a factor, value, or weight that is less favorable regarding elderly applicants than the creditor's experience warrants or is less favorable than the factor, value, or weight assigned to the class of applicants that are not classified as elderly and are most favored by a creditor on the basis of age.

(w) *Open-end credit* means credit extended under a plan in which a creditor may permit an applicant to make purchases or obtain loans from time to time directly from the creditor or indirectly by use of a credit card, check, or other device.

(x) *Person* means a natural person, corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association.

(y) *Pertinent element of creditworthiness*, in relation to a judgmental system of evaluating applicants, means any information about applicants that a creditor obtains and considers and that has a demonstrable relationship to a determination of creditworthiness.

(z) *Prohibited basis* means race, color, religion, national origin, sex, marital status, or age (provided that the applicant has the capacity to enter into a binding contract); the fact that all or part of the applicant's income derives

from any public assistance program; or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act or any state law upon which an exemption has been granted by the Board.

(aa) *State* means any state, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

§ 202.3  **Limited exceptions for certain classes of transactions.**

(a) *Public utilities credit*—(1) *Definition.* Public utilities credit refers to extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service, delayed payment, and any discount for prompt payment are filed with or regulated by a government unit.

(2) *Exceptions.* The following provisions of this regulation do not apply to public utilities credit:

(i) Section 202.5(d)(1) concerning information about marital status; and

(ii) Section 202.12(b) relating to record retention.

(b) *Securities credit*—(1) *Definition.* Securities credit refers to extensions of credit subject to regulation under section 7 of the Securities Exchange Act of 1934 or extensions of credit by a broker or dealer subject to regulation as a broker or dealer under the Securities Exchange Act of 1934.

(2) *Exceptions.* The following provisions of this regulation do not apply to securities credit:

(i) Section 202.5(b) concerning information about the sex of an applicant;

(ii) Section 202.5(c) concerning information about a spouse or former spouse;

(iii) Section 202.5(d)(1) concerning information about marital status;

(iv) Section 202.7(b) relating to designation of name to the extent necessary to comply with rules regarding an account in which a broker or dealer has an interest, or rules regarding the aggregation of accounts of spouses to determine controlling interests, beneficial interests, beneficial ownership, or purchase limitations and restrictions;

18

**Federal Reserve System**                                    **§ 202.5**

(v) Section 202.7(c) relating to action concerning open-end accounts, to the extent the action taken is on the basis of a change of name or marital status;

(vi) Section 202.7(d) relating to the signature of a spouse or other person;

(vii) Section 202.10 relating to furnishing of credit information; and

(viii) Section 202.12(b) relating to record retention.

(c) *Incidental credit*—(1) *Definition.* Incidental credit refers to extensions of consumer credit other than the types described in paragraphs (a) and (b) of this section:

(i) That are not made pursuant to the terms of a credit card account;

(ii) That are not subject to a finance charge (as defined in Regulation Z, 12 CFR 226.4); and

(iii) That are not payable by agreement in more than four installments.

(2) *Exceptions.* The following provisions of this regulation do not apply to incidental credit:

(i) Section 202.5(b) concerning information about the sex of an applicant, but only to the extent necessary for medical records or similar purposes;

(ii) Section 202.5(c) concerning information about a spouse or former spouse;

(iii) Section 202.5(d)(1) concerning information about marital status;

(iv) Section 202.5(d)(2) concerning information about income derived from alimony, child support, or separate maintenance payments;

(v) Section 202.7(d) relating to the signature of a spouse or other person;

(vi) Section 202.9 relating to notifications;

(vii) Section 202.10 relating to furnishing of credit information; and

(viii) Section 202.12(b) relating to record retention.

(d) *Government credit*—(1) *Definition.* Government credit refers to extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities.

(2) *Applicability of regulation.* Except for § 202.4(a), the general rule against discrimination on a prohibited basis, the requirements of this regulation do not apply to government credit.

**§ 202.4    General rules.**

(a) *Discrimination.* A creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction.

(b) *Discouragement.* A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

(c) *Written applications.* A creditor shall take written applications for the dwelling-related types of credit covered by § 202.13(a).

(d) *Form of disclosures*—(1) *General rule.* A creditor that provides in writing any disclosures or information required by this regulation must provide the disclosures in a clear and conspicuous manner and, except for the disclosures required by §§ 202.5 and 202.13, in a form the applicant may retain.

(2) *Disclosures in electronic form.* The disclosures required by this part that are required to be given in writing may be provided to the applicant in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.*). Where the disclosures under §§ 202.5(b)(1), 202.5(b)(2), 202.5(d)(1), 202.5(d)(2), 202.13, and 202.14(a)(2)(i) accompany an application accessed by the applicant in electronic form, these disclosures may be provided to the applicant in electronic form on or with the application form, without regard to the consumer consent or other provisions of the E-Sign Act.

(e) *Foreign-language disclosures.* Disclosures may be made in languages other than English, provided they are available in English upon request.

[Reg. B, 68 FR 13161, Mar. 18, 2003, as amended at 72 FR 63451, Nov. 9, 2007]

**§ 202.5    Rules concerning requests for information.**

(a) *General rules*—(1) *Requests for information.* Except as provided in paragraphs (b) through (d) of this section, a creditor may request any information

19

**Federal Reserve System**                                    **Pt. 202, Supp. I**

To obtain the statement, please contact [name, address and telephone number of the person or office from which the statement of reasons can be obtained] within 60 days from the date you are notified of our decision. We will send you a written statement of reasons for the denial within 30 days of receiving your request for the statement.

Notice: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is [name and address as specified by the appropriate agency listed in appendix A].

Form C–9—Sample Disclosure of Right To Receive a Copy of an Appraisal

You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please write to us at the mailing address we have provided. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application.

[In your letter, give us the following information:]

Form C–10—Sample Disclosure About Voluntary Data Notation

We are requesting the following information to monitor our compliance with the federal Equal Credit Opportunity Act, which prohibits unlawful discrimination. You are not required to provide this information. We will not take this information (or your decision not to provide this information) into account in connection with your application or credit transaction. The law provides that a creditor may not discriminate based on this information, or based on whether or not you choose to provide it. [If you choose not to provide the information, we will note it by visual observation or surname].

APPENDIX D TO PART 202—ISSUANCE OF STAFF INTERPRETATIONS

1. *Official Staff Interpretations.* Officials in the Board's Division of Consumer and Community Affairs are authorized to issue official staff interpretations of this regulation. These interpretations provide the protection afforded under section 706(e) of the Act. Except in unusual circumstances, such interpretations will not be issued separately but will be incorporated in an official com-

mentary to the regulation, which will be amended periodically.

2. *Requests for Issuance of Official Staff Interpretations.* A request for an official staff interpretation should be in writing and addressed to the Director, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, DC 20551. The request should contain a complete statement of all relevant facts concerning the issue, including copies of all pertinent documents.

3. *Scope of Interpretations.* No staff interpretations will be issued approving creditors' forms or statements. This restriction does not apply to forms or statements whose use is required or sanctioned by a government agency.

SUPPLEMENT I TO PART 202—OFFICIAL STAFF INTERPRETATIONS

Following is an official staff interpretation of Regulation B (12 CFR part 202) issued under authority delegated by the Federal Reserve Board to officials in the Division of Consumer and Community Affairs. References are to sections of the regulation or the Equal Credit Opportunity Act (15 U.S.C. 1601 *et seq.*).

*Introduction*

1. *Official status.* Section 706(e) of the Equal Credit Opportunity Act protects a creditor from civil liability for any act done or omitted in good faith in conformity with an interpretation issued by a duly authorized official of the Federal Reserve Board. This commentary is the means by which the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation B. Good-faith compliance with this commentary affords a creditor protection under section 706(e) of the Act.

2. *Issuance of interpretations.* Under Appendix D to the regulation, any person may request an official staff interpretation. Interpretations will be issued at the discretion of designated officials and incorporated in this commentary following publication for comment in the FEDERAL REGISTER. Except in unusual circumstances, official staff interpretations will be issued only by means of this commentary.

3. *Status of previous interpretations.* Interpretations of Regulation B previously issued by the Federal Reserve Board and its staff have been incorporated into this commentary as appropriate. All other previous Board and staff interpretations, official and unofficial, are superseded by this commentary.

4. *Footnotes.* Footnotes in the regulation have the same legal effect as the text of the regulation, whether they are explanatory or illustrative in nature.

**Pt. 202, Supp. I**                                              **12 CFR Ch. II (1–1–10 Edition)**

5. *Comment designations.* The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. Each comment in the commentary is identified by a number and the regulatory section or paragraph that it interprets. For example, comments to §202.2(c) are further divided by subparagraph, such as comment 2(c)(1)(ii)–1 and comment 2(c)(2)(ii)–1.

Section 202.1—Authority, Scope, and Purpose

1(a) *Authority and scope.*

1. *Scope.* The Equal Credit Opportunity Act and Regulation B apply to all credit—commercial as well as personal—without regard to the nature or type of the credit or the creditor. If a transaction provides for the deferral of the payment of a debt, it is credit covered by Regulation B even though it may not be a credit transaction covered by Regulation Z (Truth in Lending) (12 CFR part 226). Further, the definition of creditor is not restricted to the party or person to whom the obligation is initially payable, as is the case under Regulation Z. Moreover, the Act and regulation apply to all methods of credit evaluation, whether performed judgmentally or by use of a credit scoring system.

2. *Foreign applicability.* Regulation B generally does not apply to lending activities that occur outside the United States. The regulation does apply to lending activities that take place within the United States (as well as the Commonwealth of Puerto Rico and any territory or possession of the United States), whether or not the applicant is a citizen.

3. *Board.* The term *Board,* as used in this regulation, means the Board of Governors of the Federal Reserve System.

Section 202.2—Definitions

2(c) *Adverse action.*

Paragraph 2(c)(1)(i)

1. *Application for credit.* If the applicant applied in accordance with the creditor's procedures, a refusal to refinance or extend the term of a business or other loan is adverse action.

Paragraph 2(c)(1)(ii)

1. *Move from service area.* If a credit card issuer terminates the open-end account of a customer because the customer has moved out of the card issuer's service area, the termination is adverse action unless termination on this ground was explicitly provided for in the credit agreement between the parties. In cases where termination is adverse action, notification is required under §202.9.

2. *Termination based on credit limit.* If a creditor terminates credit accounts that have low credit limits (for example, under $400)

but keeps open accounts with higher credit limits, the termination is adverse action and notification is required under §202.9.

Paragraph 2(c)(2)(ii)

1. *Default—exercise of due-on-sale clause.* If a mortgagor sells or transfers mortgaged property without the consent of the mortgagee, and the mortgagee exercises its contractual right to accelerate the mortgage loan, the mortgagee may treat the mortgagor as being in default. An adverse action notice need not be given to the mortgagor or the transferee. (See comment 2(e)–1 for treatment of a purchaser who requests to assume the loan.)

2. *Current delinquency or default.* The term adverse action does not include a creditor's termination of an account when the accountholder is currently in default or delinquent on that account. Notification in accordance with §202.9 of the regulation generally is required, however, if the creditor's action is based on a past delinquency or default on the account.

Paragraph 2(c)(2)(iii)

1. *Point-of-sale transactions.* Denial of credit at point of sale is not adverse action except under those circumstances specified in the regulation. For example, denial at point of sale is not adverse action in the following situations:

i. A credit cardholder presents an expired card or a card that has been reported to the card issuer as lost or stolen.

ii. The amount of a transaction exceeds a cash advance or credit limit.

iii. The circumstances (such as excessive use of a credit card in a short period of time) suggest that fraud is involved.

iv. The authorization facilities are not functioning.

v. Billing statements have been returned to the creditor for lack of a forwarding address.

2. *Application for increase in available credit.* A refusal or failure to authorize an account transaction at the point of sale or loan is not adverse action except when the refusal is a denial of an application, submitted in accordance with the creditor's procedures, for an increase in the amount of credit.

Paragraph 2(c)(2)(v)

1. *Terms of credit versus type of credit offered.* When an applicant applies for credit and the creditor does not offer the credit terms requested by the applicant (for example, the interest rate, length of maturity, collateral, or amount of downpayment), a denial of the application for that reason is adverse action (unless the creditor makes a counteroffer that is accepted by the applicant) and the applicant is entitled to notification under §202.9.

2(e) *Applicant.*

50

**7a**

rely on an applicant's statement of the purpose for the credit requested.

*2(j) Credit.*

1. *General.* Regulation B covers a wider range of credit transactions than Regulation Z (Truth in Lending). Under Regulation B, a transaction is credit if there is a right to defer payment of a debt—regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge.

*2(l) Creditor.*

1. *Assignees.* The term creditor includes all persons participating in the credit decision. This may include an assignee or a potential purchaser of the obligation who influences the credit decision by indicating whether or not it will purchase the obligation if the transaction is consummated.

2. *Referrals to creditors.* For certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with §202.4(a), the general rule prohibiting discrimination, and with §202.4(b), the general rule against discouraging applications.

*2(p) Empirically derived and other credit scoring systems.*

1. *Purpose of definition.* The definition under §202.2(p)(1)(i) through (iv) sets the criteria that a credit system must meet in order to use age as a predictive factor. Credit systems that do not meet these criteria are judgmental systems and may consider age only for the purpose of determining a ''pertinent element of creditworthiness.'' (Both types of systems may favor an elderly applicant. See §202.6(b)(2).)

2. *Periodic revalidation.* The regulation does not specify how often credit scoring systems must be revalidated. The credit scoring system must be revalidated frequently enough to ensure that it continues to meet recognized professional statistical standards for statistical soundness. To ensure that predictive ability is being maintained, the creditor must periodically review the performance of the system. This could be done, for example, by analyzing the loan portfolio to determine the delinquency rate for each score interval, or by analyzing population stability over time to detect deviations of recent applications from the applicant population used to validate the system. If this analysis indicates that the system no longer predicts risk with statistical soundness, the system must be adjusted as necessary to re-establish its predictive ability. A creditor is responsible for ensuring its system is vali-

dated and revalidated based on the creditor's own data.

3. *Pooled data scoring systems.* A scoring system or the data from which to develop such a system may be obtained from either a single credit grantor or multiple credit grantors. The resulting system will qualify as an empirically derived, demonstrably and statistically sound, credit scoring system provided the criteria set forth in paragraph (p)(1)(i) through (iv) of this section are met. A creditor is responsible for ensuring its system is validated and revalidated based on the creditor's own data when it becomes available.

4. *Effects test and disparate treatment.* An empirically derived, demonstrably and statistically sound, credit scoring system may include age as a predictive factor (provided that the age of an elderly applicant is not assigned a negative factor or value). Besides age, no other prohibited basis may be used as a variable. Generally, credit scoring systems treat all applicants objectively and thus avoid problems of disparate treatment. In cases where a credit scoring system is used in conjunction with individual discretion, disparate treatment could conceivably occur in the evaluation process. In addition, neutral factors used in credit scoring systems could nonetheless be subject to challenge under the effects test. (See comment 6(a)–2 for a discussion of the effects test).

*2(w) Open-end credit.*

1. *Open-end real estate mortgages.* The term ''open-end credit'' does not include negotiated advances under an open-end real estate mortgage or a letter of credit.

*2(z) Prohibited basis.*

1. *Persons associated with applicant.* As used in this regulation, prohibited basis refers not only to characteristics—the race, color, religion, national origin, sex, marital status, or age—of an applicant (or officers of an applicant in the case of a corporation) but also to the characteristics of individuals with whom an applicant is affiliated or with whom the applicant associates. This means, for example, that under the general rule stated in §202.4(a), a creditor may not discriminate against an applicant because of that person's personal or business dealings with members of a certain religion, because of the national origin of any persons associated with the extension of credit (such as the tenants in the apartment complex being financed), or because of the race of other residents in the neighborhood where the property offered as collateral is located.

2. *National origin.* A creditor may not refuse to grant credit because an applicant comes from a particular country but may take the applicant's immigration status into account. A creditor may also take into account any applicable law, regulation, or executive order restricting dealings with citizens (or the government) of a particular

52

8a

**Federal Reserve System**

**Pt. 202, Supp. I**

country or imposing limitations regarding credit extended for their use.

3. *Public assistance program.* Any federal, state, or local governmental assistance program that provides a continuing, periodic income supplement, whether premised on entitlement or need, is "public assistance" for purposes of the regulation. The term includes (but is not limited to) Temporary Aid to Needy Families, food stamps, rent and mortgage supplement or assistance programs, social security and supplemental security income, and unemployment compensation. Only physicians, hospitals, and others to whom the benefits are payable need consider Medicare and Medicaid as public assistance.

Section 202.3—Limited Exceptions for Certain Classes of Transactions

1. *Scope.* Under this section, procedural requirements of the regulation do not apply to certain types of credit. All classes of transactions remain subject to §202.4(a), the general rule barring discrimination on a prohibited basis, and to any other provision not specifically excepted.

3(a) *Public-utilities credit.*

1. *Definition.* This definition applies only to credit for the purchase of a utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—such as for financing the purchase of a gas dryer, telephone equipment, or other durable goods, or for insulation or other home improvements—is not excepted.

2. *Security deposits.* A utility company is a creditor when it supplies utility service and bills the user after the service has been provided. Thus, any credit term (such as a requirement for a security deposit) is subject to the regulation's bar against discrimination on a prohibited basis.

3. *Telephone companies.* A telephone company's credit transactions qualify for the exceptions provided in §202.3(a)(2) only if the company is regulated by a government unit or files the charges for service, delayed payment, or any discount for prompt payment with a government unit.

3(c) *Incidental credit.*

1. *Examples.* If a service provider (such as a hospital, doctor, lawyer, or merchant) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by this section, however, these particular credit extensions are excepted from compliance with certain procedural requirements as specified in §202.3(c).

3(d) *Government credit.*

1. *Credit to governments.* The exception relates to credit extended to (not by) governmental entities. For example, credit extended to a local government is covered by this exception, but credit extended to consumers by a federal or state housing agency does not qualify for special treatment under this category.

Section 202.4—General Rules

Paragraph 4(a)

1. *Scope of rule.* The general rule stated in §202.4(a) covers all dealings, without exception, between an applicant and a creditor, whether or not addressed by other provisions of the regulation. Other provisions of the regulation identify specific practices that the Board has decided are impermissible because they could result in credit discrimination on a basis prohibited by the Act. The general rule covers, for example, application procedures, criteria used to evaluate creditworthiness, administration of accounts, and treatment of delinquent or slow accounts. Thus, whether or not specifically prohibited elsewhere in the regulation, a credit practice that treats applicants differently on a prohibited basis violates the law because it violates the general rule. Disparate treatment on a prohibited basis is illegal whether or not it results from a conscious intent to discriminate.

2. *Examples.*

i. Disparate treatment would exist, for example, in the following situations:

A. A creditor provides information only on "subprime" and similar products to minority applicants who request information about the creditor's mortgage products, but provides information on a wider variety of mortgage products to similarly situated nonminority applicants.

B. A creditor provides more comprehensive information to men than to similarly situated women.

C. A creditor requires a minority applicant to provide greater documentation to obtain a loan than a similarly situated nonminority applicant.

D. A creditor waives or relaxes credit standards for a nonminority applicant but not for a similarly situated minority applicant.

ii. Treating applicants differently on a prohibited basis is unlawful if the creditor lacks a legitimate nondiscriminatory reason for its action, or if the asserted reason is found to be a pretext for discrimination.

Paragraph 4(b)

1. *Prospective applicants.* Generally, the regulation's protections apply only to persons who have requested or received an extension of credit. In keeping with the purpose of the Act—to promote the availability of credit on a nondiscriminatory basis—§202.4(b) covers acts or practices directed at prospective applicants that could discourage a reasonable person, on a prohibited basis, from applying

53

**9a**